**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WINDSOR COAL COMPANY,
Petitioner,

v.

SECRETARY OF LABOR; MINE SAFETY
AND HEALTH ADMINISTRATION;

No. 97-2766

FEDERAL MINE SAFETY  AND HEALTH
REVIEW COMMISSION,
Respondents.

NATIONAL MINING ASSOCIATION,
Amicus Curiae.

On Petition for Review of an Order
of the Federal Mine Safety and Health Administration.
(97-34-WEVA)

Argued: June 5, 1998

Decided: July 31, 1998

Before NIEMEYER and LUTTIG, Circuit Judges, and
SMITH, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** David Michael Cohen, Fund Supply Department, AMER-
ICAN ELECTRIC POWER SERVICE CORPORATION, Lancaster,

Ohio, for Petitioner. Jack Powasnik, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents. **ON BRIEF:** Marvin Krislov, Deputy Solicitor for National Operations, Edward P. Clair, Associate Solicitor, W. Christian Schumann, Counsel, Appellate Litigation, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents. Harold P. Quinn, Jr., Michael F. Duffy, NATIONAL MINING ASSOCIATION, Washington, D.C., for Amicus Curiae.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Windsor Coal Company (Windsor) has petitioned for review of a final order of the Federal Mine Safety and Health Review Commission (FMSHRC or the Commission). On June 21, 1996, an inspector of the Mine Safety and Health Administration (MSHA) issued a citation to Windsor pursuant to section 104(d)(1) of the Federal Mine Safety and Health Act of 1977 (the Mine Act), 30 U.S.C. § 801(d)(1). Windsor contested the validity of that order before an administrative law judge (ALJ) and, following a hearing on the merits, the ALJ affirmed the citation. In addition, the ALJ increased the proposed civil penalty. The decision of the ALJ became that of the Commission, when a petition for discretionary review was denied. Pursuant to 30 U.S.C. § 816(a)(1), Windsor appealed to this court. We affirm the decision in all respects.

I.

Windsor is the operator of an underground coal mine in West Liberty, West Virginia. On June 21, 1996, an MSHA inspector (the Inspector) conducted an inspection of the number nine conveyor belt

2

in Windsor's mine. During the inspection, the Inspector was accompanied by Robert Talbert, a representative of Windsor and the shift supervisor of all underground areas, and Tom Kacsmar, a representative of the United Mine Workers of America.

The number nine belt is one of several main conveyor belts at the Windsor mine. The series of conveyor belts are used to transport coal through and out of the coal mine, as the coal is mined underground. Coal is deposited onto the number nine belt at its tail end and is transported to the belt head, where the coal is then deposited onto the number eight belt. The number eight belt transports the coal out of the mine.

The number nine belt measures forty-eight inches in width, and approximately 3,000 feet in length, running from crosscut 191 (the belt head) to crosscut 227 (the tail end). The belt moves by passing over 12,000 upper and lower rollers, and is powered by motors at the head drive. The number nine belt moves approximately 2,000 to 2,500 tons of coal per minute.

During the inspection, the Inspector and Kacsmar, observed large amounts of coal dust and loose coal[1] underneath and alongside the belt from the belt head at crosscut 191 to crosscut 206 and from the tail scraper, located beyond crosscut 225, to the tail end. The depth of the accumulations varied from a few inches to as much as fifty-four inches. The deepest accumulation, which was located at the tail end of the belt, measured fifty-four inches deep, twelve and one-half feet long, and seventy-five inches wide. The accumulations at the tail end were piled higher than the belt. At another location, between crosscuts 197 and 198, the accumulation was thirty-five feet long, twenty-seven inches wide, and fifteen inches deep. While the number nine belt was running, the Inspector, Kacsmar, and Talbert observed the belt and rollers touching or turning in loose coal and coal dust at various places along the belt. In some areas the coal was packed up around

_____

[1] Coal dust and loose coal are small particles of coal that are created during the mining process. Coal dust is defined as that which can pass through a number 20 sieve, and loose coal is defined as coal fragments larger than coal dust. 30 C.F.R. § 75.400-1.

3

the rollers. The Inspector and Kacsmar both testified that some of the accumulations touching the belt were warm.

The accumulations were due, in large part, to a tear along the side of the belt. The tear was five inches wide and 500 feet long. Larry Moore, a worker who had been periodically assigned to clean the belt area, noticed the tear a few days prior to the inspection. He informed a belt foreman of that tear, as well as a tear down the center of the belt, which was approximately 150 feet in length. As of the day of the inspection, the center tear, but not the side tear, had been repaired. Because replacing the belt strip would have required at least one shift of four to six miners, Windsor had decided to delay the replacement of the torn belt until the upcoming vacation period. [2] The miners' scheduled vacation was to begin two shifts after the shift in which the inspection was conducted.

At the time of the inspection, only one miner was assigned to clean the area around belt nine. Moreover, a review of the preshift and onshift reports led the Inspector, and ultimately the ALJ, to conclude that Windsor had allowed accumulations of coal to remain in areas along the belt for days during the week preceding the inspection.

The Inspector also observed a total of eighteen broken or stuck rollers along belt nine. At crosscut 201, he touched a roller with a bad bearing that was hot to the touch--so hot that he could not keep his hands on the shaft. According to the Inspector, there was loose coal and coal dust under this area. The Inspector also observed open doors and holes in the stoppings, which are used to separate airways between the track entry and the number nine belt entry. The track entry is the escape route for the section and, under the conditions observed by the Inspector, the entry would become filled with smoke in the event of a fire.[3]

_____

[2] Windsor had attempted to reduce some of the spillage caused by the tear by splicing and centering the belt. This reduced the belt by two and one-half inches on each side, rather than by five inches on one side.
[3] Based on this observation, the Inspector issued a citation for a violation of 30 C.F.R. § 75.333, which requires that permanent stoppings or other permanent ventilation control devices be maintained and that doors remain closed when not in use.

4

Following the inspection, the Inspector issued a Section 104(d)(1) citation[4] for a violation of the mandatory safety standard of 30 C.F.R. § 75.400, which prohibits coal dust accumulations in the active workings of the mine.[5] The Inspector further found that the violation was both "significant and substantial" and "unwarrantable," as defined in 30 U.S.C. § 814(d)(1), which provides in part:

> If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could <u>significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply</u> with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this Act.

(emphasis added). As a result of the citation and findings by the Inspector, the Secretary of Labor (the Secretary) proposed a civil penalty of $1,500.

_____

[4] The Section 104(d)(1) citation was originally issued as a section 104(d)(1) order. The Mine Act provides for escalating enforcement sanctions under Section 104(d) of the Act, so that some of the violations hinge on the issuance of a prior citation. For example, before a Section 104(d)(1) withdrawal order may be issued, there must have been a Section 104(d)(1) citation issued within the preceding 90 days. In this case, the prior Section 104(d)(1) citation had been reclassified as a Section 104(a)(1) citation. Consequently, on August 27, 1996, the Section 104(d)(1) order issued on June 21, 1996, was reclassified as a Section 104(d)(1) citation.

[5] 30 C.F.R. § 75.400 provides:

> Coal dust, including float coal dust deposited on rock-dusted surfaces, loose coal, and other combustible materials, shall be cleaned up and not permitted to accumulate in active workings, or on diesel-powered and electric equipment therein.

5

Windsor contested the allegation that the violation was substantial and significant and due to an unwarrantable failure to comply. Windsor also objected to the proposed civil penalty. A hearing was held before a Commission ALJ on April 15-16, 1997. On October 20, 1997, the ALJ issued a decision affirming the citation and assessing a civil penalty of $4,000, specifically finding that the violation of 30 C.F.R. § 75.400 was significant and substantial and the result of Windsor's unwarrantable failure to comply.

The ALJ's opinion became the final order of the Commission after the Commission denied discretionary review. Pursuant to 30 U.S.C. § 816(a), Windsor appealed to this court. Windsor does not challenge the ALJ's finding of a violation. Rather, Windsor challenges the findings that the violation was significant and substantial and due to an unwarrantable failure to comply. Windsor also objects to the amount of the assessed penalty, maintaining that the circumstances surrounding the violation did not warrant the increased penalty.

II.

We review the ALJ's findings to determine if they are supported by substantial evidence in the record. 30 U.S.C.§ 816(a); see, e.g., Consolidation Coal Co. v. FMSHRC, 795 F.2d 364, 368 (4th Cir. 1986). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Moreover, the "`possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Secretary of Labor v. Mutual Mining, Inc., 80 F.3d 110, 113 (4th Cir. 1996) (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 610 (1966)).

Windsor argues that there is not substantial evidence to support the finding that the violation was "significant and substantial" within the meaning of Section 104(d)(1). To establish that a violation of a safety standard is "significant and substantial" the following conditions must be met: (1) an underlying violation of a mandatory safety standard; (2) a discrete safety hazard--that is, a measure of danger to safety-- contributed to by the violation; (3) a reasonable likelihood that the

6

safety hazard contributed to will result in injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature. Mathies Coal Co., 6 FMSHC 1, 3-4 (1984).

The ALJ found that the violation was significant and substantial due to the extensive accumulations of coal in combination with the stuck and broken rollers, which could then reasonably act as ignition sources. The ALJ also found that the ventilation problems, also observed on the morning of the inspection, increased the hazard from a belt fire; smoke from a fire would be able to travel to other sections of the mine. Specifically, the ALJ found "that the violation was reasonably likely to result in fire or the propagation of a fire causing death or serious injuries." J.A. at 433-435.

Windsor objects to the Commission's determination that the violation is reasonably likely to result in a fire. Windsor argues that the evidence as a whole supports the conclusion that there was no likelihood of a fire. In particular, the company relies on the following factors, which it maintains was supported by the evidence: (1) the use of dust suppression sprays; (2) rock dusting; (3) lack of methane emissions; and (4) the lack of heat being generated by the rollers. Although Windsor can point to some factual support for its argument, there remains substantial evidence to support the ALJ's contrary conclusion.

Adequate rock dusting does render coal accumulations inert. However, in this case the top of the accumulations consisted of fresh coal. In addition, there was no rock dust mixed in with the accumulations located at the tail piece. Moreover, despite the diminished potential for an explosion due to low methane levels and dust suppression sprays, there was sufficient evidence to find that the conditions at belt nine were reasonably likely to cause or propagate a fire. The coal accumulations were extensive and there was ample evidence to support the finding that possible ignition sources were located along the belt. Eighteen of the rollers were broken, including one that was very hot to the touch. In addition, the belt and some rollers were touching or turning in coal dust, and in some places the accumulations were warm. See Buck Creek Coal, Inc. v. Fed. Mine Safety and Health Admin., 52 F.3d 133, 135 & 136 n.1 (7th Cir. 1995) (finding the ALJ's conclusion that the coal accumulations were likely to cause a

7

fire was clearly supported by substantial evidence under facts similar to the case at bar).

Windsor also contends that substantial evidence does not support the ALJ's finding of an "unwarrantable failure." An MSHA inspector is to determine whether a violation is caused "by an unwarrantable failure of . . . [an] operator to comply with . . . mandatory safety or health standards. . . ." Section 104(d)(1) of the Mine Act, 30 U.S.C. § 814(d)(1). An "unwarrantable failure" is conduct that is "not justifiable" or is "inexcusable." Secretary of Labor v. S & H Mining, Inc., 15 FMSHRC 2387, 2390 (1993). It has also been defined as "aggravated conduct, constituting more than ordinary negligence, by a mine operator in relation to a violation of the Act." Jim Walter Resources v. Secretary of Labor, Mine Safety and Health Admin. , 103 F.3d 1020, 1025 (D.C. Cir. 1997) (citing Emery Mining Corp. v. Secretary of Labor, 9 FMSHRC 1997, 2004 (1987)).

In affirming the Inspector's citation, the ALJ found that the violation was due to aggravated conduct beyond ordinary negligence. The ALJ found that the accumulations were obvious and extensive and that the violative accumulations had existed for a substantial period of time prior to the issuance of the citation. He further found that, although Windsor knew of the problems with the conveyor belt, the company failed to take adequate measures to clean up and prevent the extensive and widespread accumulation of combustible materials. This finding was based on Windsor's decision to delay necessary repairs to the belt and to continue production until the miners' vacation period. It was also based, inter alia, on the fact that only one miner was assigned to clean the belt nine area on the night of the inspection.

Windsor argues that the ALJ should have given more weight to the corrective measures it did take, such as replacing the faulty tail roller, repairing the center belt split, and adjusting the belt alignment to reduce spillage caused by the 500 foot tear. Although these efforts do indicate that Windsor took some action to limit the amount of accumulations, we cannot say that the ALJ erred in its finding of an unwarrantable failure. There clearly is substantial evidence in the record to support the ALJ's conclusion that Windsor deliberately

8

failed to take <u>adequate</u> measures to comply with a mandatory safety standard.

III.

Windsor also argues that the civil penalty imposed for the violation is excessive. Following a hearing, the ALJ is authorized to determine de novo the amount of the civil penalties that should be imposed pursuant to the factors set forth in 30 U.S.C. § 820(I).**6** In assessing the penalty, the ALJ found the Secretary's proposed penalty of $1,200 inadequate to effectuate the intent and purpose of the Act. The ALJ, thus, increased the civil penalty to $4,000.**7** We review civil penalties only for abuse of discretion. <u>See, e.g.</u>, <u>B.L. Anderson, Inc. v. FMSHRC</u>, 668 F.2d 442, 444 (8th Cir. 1982).

Windsor contests the ALJ's findings and conclusions concerning its history of violations, its negligence, and the gravity of the violations. However, we cannot find that the ALJ erred in his application of the statutory criteria to the facts of this case. Windsor had committed over one hundred violations of Section 75.400 during the two-year period preceding the inspection on June 21, 1996. Furthermore, all eleven of the most recent Section 75.400 violations were for accumulations along belt lines, two of them along the number nine belt. Thus, the ALJ did not err in finding that Windsor's history of Section 75.400 violation was poor. In light of this court's decision regarding

---

**6** The following factors must be considered in assessing penalties:

> (1) the operator's history of previous violations; (2) the appropriateness of such penalty to the size of the business of the operator charged; (3) whether the operator was negligent; (4) the effect on the operator's ability to continue in business; (5) the gravity of the violation; and (6) the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation.

30 U.S.C. § 820(I).

**7** Although the fine is greater than that recommended by the Secretary, it is considerably less than the maximum permitted under the statute. The maximum penalty that could have been imposed for the violation is $50,000. 30 U.S.C. § 820(a).

the nature of the violation, we cannot say the ALJ erred in finding that the violation was serious or that it was due to a high degree of negligence. Accordingly, we find that the penalty imposed was not an abuse of discretion.

IV.

Considering the record as a whole, there is substantial evidence to support the ALJ's findings of fact. In addition, upon the facts of the present case, the imposed penalty was not excessive or an abuse of discretion. For the foregoing reasons, the Order of the Commission is affirmed.

AFFIRMED

10