# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 19, 2009                Decided May 14, 2010

No. 07-1533

FLORIDA GAS TRANSMISSION COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTHERN NATURAL GAS COMPANY, ET AL.,
INTERVENORS

———

Consolidated with 08-1062

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Steve Stojic* argued the cause for petitioner Florida Gas Transmission Company, LLC. With him on the briefs was *Frank X. Kelly*.

*Sarah E. Tomalty* argued the cause and filed the briefs for petitioner Florida Power & Light Company. *Barbara S. Jost* entered an appearance.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Cynthia A. Marlette*, General Counsel, *Robert H. Solomon*, Solicitor, and *Judith A. Albert*, Senior Attorney.

*Katherine B. Edwards*, *John Paul Floom*, *R. David Hendrickson*, *Steve Stojic*, and *Frank X. Kelly* were on the brief for intervenors Florida Gas Transmission Company, LLC, et al. in support of respondent.

Before: SENTELLE, *Chief Judge*, BROWN, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* BROWN.

SENTELLE, *Chief Judge*: Florida Gas Transmission Company, LLC (Florida Gas) and Florida Power & Light Company (Florida Power) each petition for review of Federal Energy Regulatory Commission (FERC or Commission) orders establishing new gas quality and interchangeability standards for Florida Gas's interstate natural gas pipeline system. Florida Gas challenges the geographic scope of the new standards. In a separate petition, Florida Power contests the breadth of the specific interchangeability standard adopted and the Commission's refusal to establish a cost-recovery mechanism for end-user mitigation costs. For the reasons set forth below, we grant Florida Gas's petition, but deny Florida Power's petition.

## I. Background

Petitioner Florida Gas owns and operates an interstate

natural gas pipeline system that runs from Texas to Florida. Petitioner Florida Power is a public utility that generates electricity using natural gas–fueled turbines connected to the Florida Gas system (FGT system). The FGT system was constructed in 1959 to transport domestic natural gas from Texas, Louisiana, Mississippi, and Alabama into Florida. *AES Ocean Express LLC v. Fla. Gas Transmission Co.*, 119 F.E.R.C. ¶ 61,075 at ¶ 2 (Apr. 20, 2007) (*Initial Order*). About 80 percent of its throughput goes to electric generators; the remainder goes to local distribution companies. *Id.* For regulatory purposes, the FGT system is divided into two geographic regions: the Western Division, which includes its facilities west of the Alabama-Florida state line, and the Market Area, which includes its facilities east of that line. *Id.*

In January 2004, the Commission authorized AES Ocean Express LLC (AES) to construct and operate a natural gas pipeline that would transport revaporized liquid natural gas (LNG) and interconnect with the FGT system in the Market Area. *Id.* ¶ 3. When AES and Florida Gas were unable to reach an interconnection agreement, AES filed a complaint alleging that Florida Gas was insisting on unnecessary and onerous terms, including certain conditions relating to gas quality and interchangeability. *Id.* ¶ 4. In response to the complaint, the Commission noted that while the FGT system had primarily transported domestic natural gas, four new suppliers were seeking interconnections that would introduce revaporized LNG directly into the Market Area. *Id.* ¶ 5. Given that the composition of revaporized LNG can differ significantly from that of domestic natural gas, the Commission surmised that these new sources of revaporized LNG might create operational problems. *Id.* To forestall such problems, it ordered Florida Gas to file tariff revisions addressing its gas quality and interchangeability standards. *Id.* ¶ 7.

After Florida Gas filed *pro forma* tariff sheets in July 2004, the Commission determined that the issues concerning gas quality and interchangeability warranted a hearing. *Id.* ¶ 8. After holding an extensive hearing, the presiding Administrative Law Judge (ALJ) issued an initial decision in April 2006. *Id.* ¶ 12. In April 2007, the Commission largely affirmed the ALJ's decision in its *Initial Order*, which mandated new gas quality and interchangeability standards for the FGT system's Market Area. *Id.* ¶ 16. Although various parties (including Florida Gas and Florida Power) petitioned for rehearing, the Commission denied rehearing on the issues raised in this case. *AES Ocean Express LLC v. Fla. Gas Transmission Co.*, 121 F.E.R.C. ¶ 61,267 (Dec. 20, 2007) (*Order on Rehearing*). These petitions followed. They raise three distinct issues: (1) the geographic scope of the new standards (raised by Florida Gas), (2) the specific interchangeability standard adopted (raised by Florida Power), and (3) the lack of a cost-recovery mechanism for end-user mitigation costs (raised by Florida Power). We address these issues *seriatim*, incorporating additional background information as needed.

## II. Analysis

We have jurisdiction to consider these petitions under § 19(b) of the Natural Gas Act (NGA), 15 U.S.C. § 717r(b). The Administrative Procedure Act requires us to "hold unlawful and set aside" the challenged aspects of the Commission's orders to the extent they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, the Commission "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record." *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1319 (D.C. Cir. 2004) (quoting *N. States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994)). In addition, we must "ensure that FERC 'articulate[s] a

satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

A. *Geographic Scope*

In developing the new standards, the Commission considered two distinct questions about their scope. First, it considered whether the new standards should apply throughout the FGT system, or only in the Market Area. Second, it considered whether the standards should apply to all natural gas, or only to revaporized LNG. Florida Gas proposed new standards that would only have governed Market Area receipts of revaporized LNG. *Initial Order* ¶ 208. The ALJ agreed that the new standards should only address revaporized LNG, but concluded that they should govern all receipts of revaporized LNG, not just those that occurred in the Market Area. *Id.* ¶¶ 209, 220–21. The Commission reversed, concluding that the new standards would only apply in the Market Area. *Id.* ¶ 227. Responding to end-user concerns, however, it determined that the new gas quality standards would apply not just to revaporized LNG, but to all natural gas received in the Market Area. *Id.* ¶¶ 212–18. Moreover, the Commission declared that "[t]he gas quality receipt point standards for the Market Area will apply equally to receipts from the Western Division." *Id.* ¶ 230. Thus it imposed the new standards on the commingled stream of natural gas already flowing through the FGT system where it entered the Market Area from the Western Division.

At this border, though, the natural gas stream crosses the invisible regulatory line that separates the Western Division from the Market Area. Other than that, nothing significant occurs at this point—there is no receipt point, processing facility, or anything else that might affect the composition of the

commingled stream. Florida Gas contends that the Commission's decision to impose the new gas quality and interchangeability standards at this border violates § 5 of the NGA.

### 1. *Section 5 Authority*

Section 5(a) of the NGA authorizes the Commission to determine "just and reasonable" tariff provisions once it has found the existing tariff provisions "unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. § 717d(a). A finding that the existing tariff provisions are unjust or unreasonable is a prerequisite for exercising authority under § 5 of the NGA. *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 186–87 (D.C. Cir. 1986); *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 514 (D.C. Cir. 1985). The Commission acknowledged this statutory requirement when it reversed the ALJ's decision that would have applied the new standards throughout the FGT system. It recognized that "to require Florida Gas to extend its proposed interchangeability standards to the Western Division, the Commission would have to find under NGA section 5 that their existing standards applicable to the Western Division are unjust and unreasonable." *Initial Order* ¶ 227. Yet it expressly disavowed any such finding, conceding that "[t]he record developed at the hearing is inadequate to support a finding that the current Western Division gas standards are unjust and unreasonable." *Id.* ¶ 228.

Evaluating the record, the Commission explained that while there was evidence about two imminent projects that would deliver revaporized LNG into the Market Area, there was only speculative evidence about future projects that might deliver revaporized LNG into the Western Division. *Id.* Specifically, the Commission found that it was "not clear which of these projects will ever be completed, whether they would deliver gas

to Florida Gas, how Florida Gas's operations may be impacted or whether the Western Division markets required any special gas quality considerations." *Id.* (footnotes omitted). Thus it was "difficult to find anything in this speculative and inchoate Western Division record to support a finding that the existing Florida Gas tariff is no longer just and reasonable." *Id.* The Commission also noted that although revaporized LNG had previously been delivered in the Western Division, there were "no reports in either the Western Division or the Market Area of problems from Western Division gas delivered to either market." *Id.* ¶ 229. In short, the Commission concluded that there were "no identified gas quality problems in the Western Division under its existing tariff gas quality standards." *Id.* Likewise, its *Order on Rehearing* reiterated that "[t]he record contained no evidence that past deliveries of Western Division gas have caused problems either in the Western Division or the Market Area." *Order on Rehearing* ¶ 123.

Despite a complete lack of evidence that Western Division gas caused operational problems, the Commission determined that the new standards would apply to natural gas flowing from the Western Division where it entered the Market Area. Florida Gas argues that the Commission did not make the requisite findings to support this decision. We agree. Section 5(a) requires that the Commission find the existing tariff provision "unjust, unreasonable, unduly discriminatory, or preferential" before it may exercise its § 5 authority to determine a "just and reasonable" tariff provision. 15 U.S.C. § 717d(a). Yet the Commission's orders are devoid of any such findings with respect to Western Division gas. On the contrary, the Commission explicitly found that there was no evidence that Western Division gas had ever caused problems in the Western Division *or in the Market Area.* Thus the Commission had no § 5 authority to impose the new standards on gas flowing from the Western Division into the Market Area.

The Commission's arguments to the contrary are unavailing. It contends that once it found the existing Market Area standards unjust and unreasonable, it had § 5 authority to regulate all natural gas that enters the Market Area, including gas from the Western Division. We find this contention wholly without merit. The findings that prompted the Commission to exercise § 5 authority over Market Area gas had nothing to do with gas from the Western Division. Indeed, the Commission found that Western Division gas had an unblemished record. Moreover, the gas that enters the Market Area is the same gas that left the Western Division. Its movement from the Western Division into the Market Area does not alter its composition. Thus the Commission's finding that Western Division gas has not caused problems continues to apply with equal force at the Alabama-Florida border.

The Commission asserts that a uniform interchangeability standard is necessary to ensure that interchangeable gas is delivered to Market Area end users. It insists that the new standards should apply to all gas that enters the Market Area, whether it be revaporized LNG, domestic natural gas, or the commingled stream from the Western Division. This insistence evinces an ongoing concern that Western Division gas might someday create operational problems in the Market Area. But this concern ignores the Commission's own finding that deliveries of Western Division gas have not caused problems in the Market Area. Congress has not authorized the Commission to exercise its NGA § 5 powers based on speculation, conjecture, divination, or anything short of factual findings based on substantial evidence. Absent a finding that the existing Western Division standards were unjust or unreasonable, the Commission had no authority to impose new standards on the commingled stream that flows from the Western Division into the Market Area.

2. *Imposing Standards in the Middle of the Pipeline*

Florida Gas also argues that the Commission's decision to impose the new standards in the middle of its pipeline was arbitrary and capricious. It argues that this decision deviated from the Commission's consistent prior practice of imposing such standards only at delivery/receipt points. The Commission counters that it has no such practice. Regardless of whether there was a prior practice of this sort, Florida Gas also asserts that the only logical place for imposing the new standards is at delivery/receipt points. At those points, there is a change in control, and the pipeline can identify and refuse nonconforming deliveries to ensure that its commingled stream will meet applicable gas standards.

Florida Gas raised these objections in its petition for rehearing. When the Commission refused to budge, Florida Gas sought to skirt the problem. It first filed tariff sheets that would have applied the Market Area standards at its Western Division receipt points, the last points at which it could exercise control over the composition and quality of the commingled steam before it reached the Alabama-Florida border. The Commission rejected this approach. *Fla. Gas Transmission Co.*, 119 F.E.R.C. ¶ 61,185 (May 25, 2007) (letter order). Florida Gas then sought to eliminate the language applying the new standards to gas entering the Market Area from the Western Division. The Commission likewise rejected this approach. *Fla. Gas Transmission Co.*, 120 F.E.R.C. ¶ 61,128 (Aug. 2, 2007) (letter order).

We agree with Florida Gas that the Commission did not adequately respond to its objections. First, the Commission argued that it was consistent to subject all gas that enters the Market Area to the new standards. Although it is in one sense

consistent to treat all gas identically, it is a foolish consistency in this case, for doing so equates two categorically different sources: the commingled stream from the Western Division and off-system receipts in the Market Area. Given the record, treating these two sources identically makes no sense. Second, the Commission characterized the Alabama-Florida border as a receipt point. *Initial Order* ¶ 230. But there is simply no receipt point at the Alabama-Florida border. Third, it argued that Florida Gas was in the same position as any pipeline seeking to comply with the quality standards imposed by a downstream pipeline. *Order on Rehearing* ¶ 138. But this treats Florida Gas as two separate pipelines, which it is not. If it were two different pipelines, there would be a delivery/receipt point at their interconnection, a change in control, and presumably an interconnection agreement addressing gas quality. In this case, however, there is one pipeline, no delivery/receipt point, and no change in control. Thus the Commission's responses do not address Florida Gas's fundamental objection, which is that it lacks the practical ability to control the quality of its commingled stream at the Alabama-Florida border unless it can control the quality of the upstream deliveries it receives before they commingle.

Moreover, the Commission failed to identify any mechanism through which Florida Gas (or any other pipeline) could maintain a compliant commingled stream without controlling the quality of upstream deliveries. Although the Commission rejects the suggestion that it has a policy of imposing gas quality standards only where there is a change in control, it does not dispute Florida Gas's assertion that its decision imposing the new standards in the middle of the pipeline is unprecedented. Since a commingled gas stream is the blended product of upstream deliveries, its composition necessarily varies based on the composition, volume, and timing of those deliveries. Imposing the standards on a commingled

stream without allowing the pipeline to control the quality of upstream deliveries hamstrings the pipeline's ability to meet those standards. The Commission's assertion that past performance suggests that Florida Gas may be able to meet the new standards at the Alabama-Florida border without changing its Western Division tariff, *id.* ¶ 139, only highlights the complete lack of evidence that Western Division gas poses any identifiable problem. If the Commission desires to impose standards in the middle of a pipeline, it must give a rational basis for doing so and explain in practical terms how it expects the pipeline to meet those standards going forward. It has not done so in the orders before us.

### 3. *Conclusion*

We hold that the Commission's decision imposing the new standards on gas entering the Market Area from the Western Division was arbitrary, capricious, and not in accordance with law. The Commission neither made the requisite findings before exercising § 5 authority over Western Division gas nor gave a rational explanation for imposing the new standards on the commingled stream where it enters the Market Area. We thus grant Florida Gas's petition and vacate the Commission's orders insofar as they impose the new standards on Western Division gas where it enters the Market Area.

### B. *The Interchangeability Standard*

Gas interchangeability was raised in the proceeding below because end users were "concerned about the interchangeability of imported LNG compared to the historic quality of delivered gas." *Initial Order* ¶ 31. Although natural gas is primarily composed of methane, it also includes other constituents, and its precise composition can vary from source to source. *Id.* ¶ 28. "Gas interchangeability refers to the extent to which a substitute

gas can safely and efficiently replace gas normally used by an end-use customer in a combustion application." *Id.* ¶ 29. The Wobbe Index is a measure of gas interchangeability. As the Commission explains it, "If a fuel gas stream has a constant Wobbe Index, regardless of fuel composition, a constant heat release rate will be supplied through a specific orifice at a constant supply pressure." *Id.* The Modified Wobbe Index is closely related to the Wobbe Index, but adds temperature as a variable and uses a slightly different measure for heat value. *Id.* ¶ 49 & n.79. As we understand it, and as the parties seem to assume, the differences between the Wobbe Index and the Modified Wobbe Index are immaterial when considering the percentage ranges at issue in this case. Indeed, the Commission has explained that when the focus is on percentage ranges, the differences between these indices are "so minor" that they are "virtually interchangeable." *Order on Rehearing* ¶ 39.

The historical Wobbe Index for gas delivered in the Market Area ranged from 1,346 to 1,371, with an average of 1,356. *Initial Order* ¶ 35. Florida Gas proposed a Wobbe Index range of 1,340 to 1,396, which was plus or minus 2 percent from the historical average. *Id.* The LNG suppliers sought a range of 1,302 to 1,400 (plus or minus 4 percent with a cap at 1,400). *Id.* ¶ 36. Conversely, the Florida generators (including Florida Power) pushed for a range of 1,346 to 1,371 (plus or minus 1 percent). *Id.* The ALJ determined that the range Florida Gas proposed was just and reasonable, and the Commission agreed. *Id.* ¶¶ 38, 43.

The dispute over the appropriate Wobbe Index range revolves around 55 Dry Low NOx (DLN) turbines that operate in the Market Area. *Id.* ¶ 46. These turbines, some of which were manufactured by General Electric (GE) and others manufactured by Siemens-Westinghouse, are especially sensitive to changes in gas quality. *Id.* Florida Power has 32

DLN turbines on the FGT system. In selecting a Wobbe Index range, the Commission considered evidence introduced at the hearing, including the manufacturers' specifications for the DLN turbines, other documents concerning the turbines, expert witness testimony, and the Natural Gas Council Plus Interim Guidelines (NGC+ Interim Guidelines). *Initial Order* ¶¶ 48–127. Weighing this evidence, the Commission found the manufacturers' published specifications to be the "most reliable evidence in this record as to the allowable Wobbe Index ranges of the gas the turbines may burn without operational problems." *Id.* ¶ 47. It found these specifications particularly reliable because they were "public documents that customers rely upon for ordering, operating their equipment and warranties." *Id.* ¶ 54 (footnotes omitted). According to GE's specifications, its DLN turbines could operate within a range of plus or minus 5 percent around the Modified Wobbe Index midpoint for which they were built. *Id.* ¶¶ 50–51. Likewise, the Siemens-Westinghouse specifications stated that its DLN turbines could operate within a Modified Wobbe Index range of plus or minus 2 percent around their midpoint and maintain their emission standards without needing auto-tuning. *Id.* ¶ 55. Based on this evidence, the Commission concluded that a Wobbe Index range of plus or minus 2 percent around the historical average was appropriate. *Id.* ¶ 34.

In reaching this conclusion the Commission departed from the NGC+ Interim Guidelines, which recommended adopting a Wobbe Index range of plus or minus 4 percent from the historical mean, with a maximum no greater than 1,400. It found that "the special requirements of the electric generators support Florida Gas's proposal of a Wobbe Index range with only a plus or minus 2 percent allowable variation from the midpoint, with an upper limit of 1,396, instead of the plus or minus 4 percent variation, with an upper limit of 1,400, allowed by the NGC+ Interim Guidelines." *Id.* ¶ 44. It concluded that

"the ALJ properly used the NGC+ Interim Guidelines as a starting point in determining the appropriate Wobbe Index range on the Florida Gas system, but deviated from them to the extent necessary to accommodate the circumstances on the Florida Gas system as reflected in this record." *Id.* ¶ 128.

The Commission also discounted contrary testimony from three combustion experts provided by the Florida generators. The *Initial Order* gives an exhaustive account of why it found these witnesses less reliable than the manufacturers' published specifications. *Id.* ¶¶ 89–115. Although it credited some witness testimony, it gave little weight to testimony in which the witnesses were not specific, had not considered relevant data, made inconsistent statements, or relied on anecdotal information. For example, one witness had not reviewed the manufacturers' specifications before reaching his conclusions, was not able to identify a specific Wobbe Index range that the turbines could safely accommodate, and admitted that he was not certain whether the proposed range would actually create operational problems. *Id.* ¶¶ 97–98.

Florida Power challenges the Commission's decision adopting a Wobbe Index range of 1,340 to 1,396, contending this decision was neither reached through reasoned decisionmaking nor supported by substantial evidence. It accuses the Commission of "rejecting relevant evidence," deciding "against the weight of the evidence," and "failing to make a rational connection between the facts in the case and [the] choice made." Florida Power Br. at 21–22. In evaluating this argument, we give the Commission's decision substantial deference. "When considering FERC's evaluation of 'scientific data within its technical expertise,' we afford FERC 'an extreme degree of deference.'" *Wash. Gas Light Co. v. FERC*, 532 F.3d 928, 930 (D.C. Cir. 2008) (quoting *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004)).

15

Likewise, "when agency orders involve complex scientific or technical questions . . . we are particularly reluctant to interfere with the agency's reasoned judgments." *B&J Oil & Gas v. FERC*, 353 F.3d 71, 76 (D.C. Cir. 2004). Thus we will not second-guess the Commission's technical judgment concerning the appropriate Wobbe Index range as long as that judgment was reached through reasoned decisionmaking and supported by substantial evidence.

Florida Power first contends that the Commission's decision was not based on substantial evidence. It characterizes the manufacturers' specifications the Commission relied on as a "single piece of evidence" that cannot constitute substantial evidence. Florida Power Reply Br. at 2–3. We disagree. When reviewing for substantial evidence, we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the Commission's ultimate decision. *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003). The substantial evidence inquiry turns not on how many discrete pieces of evidence the Commission relies on, but on whether that evidence adequately supports its ultimate decision. In this case, what Florida Power characterizes as a "single piece of evidence" is actually two separate documents of 24 and 25 pages respectively. Moreover, the Commission explained that it considered these public documents particularly reliable because GE and Siemens-Westinghouse had an interest in making the specifications broad enough to maximize their sales, but not too broad, lest the turbines prove unable to handle the full range, thereby disappointing customers and possibly giving rise to warranty claims. "The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002). We conclude that the manufacturers' published specifications constitute substantial evidence for the Commission's decision.

Florida Power also contends that the Commission's decision to adopt a Wobbe Index range between 1,340 and 1,396 was not reached through reasoned decisionmaking. We disagree. The Commission considered the NGC+ Interim Guidelines, which suggested a Wobbe Index range of plus or minus 4 percent, with a cap of 1,400. It also considered the sensitivity of the DLN turbines, relying on the manufacturers' specifications and a reasonable assumption that the turbines were already centered within the historical Wobbe Index range for the Market Area. Ultimately the Commission settled on a Wobbe range that was within the manufacturers' specifications, recognizing that "there may be some costs associated with retuning or recentering the turbines," but finding that "those costs should not be beyond ordinary business costs that could be expected in operating sophisticated equipment with special needs as to the fuel it burns." *Initial Order* ¶ 56.

Florida Power also asserts that the Commission should not have adopted the new standards until it knew exactly what effect those new standards would have on Florida Power's DLN turbines. But reasoned decisionmaking does not require complete prescience. In its reply brief, Florida Power argues that the Commission never considered whether end-user modifications necessitated by the new standards could be completed before revaporized LNG was introduced into the FGT system. This argument, which was not raised before the Commission or in Florida Power's initial brief, comes late and falls short. The Commission had no duty to respond to arguments Florida Power never made.

The Commission provided a thorough and lucid explanation for its ultimate decision to adopt a Wobbe Index range of 1,340 to 1,396. It identified the evidence it credited, explained why it considered some evidence more reliable than other evidence, and demonstrated how that evidence supported its ultimate

decision. Its decision exemplifies reasoned decisionmaking, and Florida Power's contention otherwise has no merit.

C. *Mitigation Costs*

In the proceeding below, electric generators and local distribution companies asked the Commission to establish a mechanism through which they could recover expenses incurred when they modified and upgraded their equipment to handle gas delivered under the new standards. The Commission gave two rationales for refusing to establish any such cost-recovery mechanism. First, it asserted that it lacked jurisdiction to require nonjurisdictional parties (LNG suppliers and shippers) to reimburse mitigation costs incurred by other nonjurisdictional parties (electric generators and local distribution companies). Second, it maintained that it had already considered end-user mitigation costs in developing the new standards and consequently adopted standards that would not impose excessive mitigation costs.

The primary reason the Commission gave for refusing to adopt a cost-recovery mechanism was that it lacked jurisdiction to do so. *Initial Order* ¶¶ 267–73. It asserted that it only had jurisdiction "to ensure that the rates, terms, and conditions of Florida Gas's transportation service are just and reasonable." *Id.* ¶ 270; *see also Order on Rehearing* ¶ 105. The Commission argued that it has no jurisdiction over first sales made by LNG suppliers, the importation of LNG (which is considered a first sale), or end users. *Initial Order* ¶¶ 268–69. Thus its jurisdiction in this proceeding was limited to ensuring that the Florida Power tariff contained just and reasonable gas quality and interchangeability standards. *Id.* ¶ 270. According to the Commission, it had no jurisdiction to require nonjurisdictional parties to reimburse electric generators and local distribution companies for their mitigation costs. *Id.* ¶¶ 272–73. In

particular, it stressed that the cost-recovery mechanism Florida Power and others sought involved shifting costs incurred by one group of nonjurisdictional entities (end users like Florida Power) to another group of nonjurisdictional entities (LNG suppliers and shippers). *Id.* ¶ 269.

The Commission also rejected the contention that it could establish a cost-recovery mechanism under § 7 or § 16 of the NGA. Section 7 gives the Commission authority to issue or withhold certificates of public convenience for the construction, extension, or abandonment of natural gas transportation facilities. 15 U.S.C. § 717f. It also provides that the Commission may attach to those certificates "such reasonable terms and conditions as the public convenience and necessity may require." § 717f(e). Section 16 provides that the Commission "shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter." § 717o(a). The parties who sought reimbursement below argued that the Commission must have the authority to allocate costs among nonjurisdictional parties because it has done so in previous proceedings. In response, the Commission distinguished those precedents and argued that § 7 does not provide independent jurisdiction to do what is otherwise outside its jurisdiction. In particular, it relied on our statement in *American Gas Ass'n v. FERC*, 912 F.2d 1496 (D.C. Cir. 1990), that "the Commission may not use its § 7 conditioning power to do indirectly (1) things that it can do only by satisfying specific safeguards not contained in § 7(e) . . . or (2), *a fortiori*, things that it cannot do at all," *id.* at 1510. *See Initial Order* ¶ 291.

Although the Commission relied heavily on this jurisdictional rationale, it also explained that even if it had jurisdiction, it would not implement the type of cost-recovery

mechanism Florida Power and other end users sought because it had already taken mitigation costs into account when it developed the new standards: "[W]e have addressed impacts on Florida Gas's customers through the approval of interchangeability standards governing the gas that can be accepted onto Florida Gas's system, and have found that the approved standards should ensure that downstream entities do not incur excessive mitigation costs." *Id.* ¶ 292. In particular, the Commission balanced the need to maximize the availability of natural gas, which militated toward less restrictive standards, with the need to avoid imposing excessive costs on end users, which militated toward more restrictive standards. *Order on Rehearing* ¶¶ 101, 107. Weighing these different interests, the Commission arrived at a compromise standard of plus or minus 2 percent. In doing so, it departed from the Wobbe Index range recommended in the NGC+ Interim Guidelines, adopting a more restrictive range that fell within the acceptable range identified in the DLN turbine manufacturers' specifications. *Initial Order* ¶¶ 271, 292; *Order on Rehearing* ¶¶ 80, 101. The Commission noted that while end users would incur some costs under the new standards, LNG suppliers might also incur costs refining their product to meet those standards. *Order on Rehearing* ¶ 102. Having balanced these costs in selecting the appropriate standards, the Commission was unwilling to upset that balance by imposing a separate cost-recovery mechanism.

In its petition, Florida Power again contends that the Commission had jurisdiction to establish a cost-recovery mechanism under § 7 and § 16 of the NGA. On the contrary, we find the Commission's jurisdictional rationale convincing. The Commission has no direct jurisdiction over the parties from which Florida Power seeks compensation. And the Commission cannot use its § 7 conditioning power to exercise direct control over nonjurisdictional parties. *See Am. Gas Ass'n*, 912 F.2d at 1510. Likewise, while § 16 gives the Commission ancillary

jurisdiction to carry out the statute's other provisions, it does not confer additional jurisdiction over parties otherwise outside the Commission's jurisdiction. *Pub. Serv. Comm'n of N.Y. v. FERC*, 866 F.2d 487, 491–92 (D.C. Cir. 1989). The cost-recovery mechanism advanced by Florida Power falls outside the Commission's jurisdiction because it would impermissibly require nonjurisdictional parties to reimburse end-user mitigation costs.

Even assuming the Commission had jurisdiction to establish a cost-recovery mechanism, as Florida Power contends, it provided an adequate alternate rationale for refusing to establish any cost-recovery mechanism. In short, the Commission explained that it already addressed the mitigation cost issue by adopting new interchangeability standards that would not impose excessive costs on electric generators. This explanation provides an independent justification for the Commission's decision to eschew any cost-recovery mechanism. Thus the Commission has adequately explained its reasons for refusing to establish a cost-recovery mechanism for end-user mitigation costs.

## III. Conclusion

For the reasons set forth above, we grant Florida Gas's petition, but deny Florida Power's petition. The challenged orders are vacated insofar as they impose the new gas quality and interchangeability standards on Western Division gas where it enters the Market Area.

*So ordered.*

BROWN, *Circuit Judge*, concurring in part and dissenting in part: I concur in the court's grant of Florida Gas' petition for review. But because FERC failed to satisfy its section 7 duty to find that the LNG projects it approved were in the public interest and failed to satisfy its section 5 burden to demonstrate Florida Gas' revised tariff was just and reasonable, I dissent from the court's denial of Florida Power's petition.

I

Early in the decade, AES Ocean Express, LLC (AES), and Southern Natural Gas Company (Southern) began efforts to import re-gasified LNG into Florida Gas' pipeline system in Florida, the "Market Area." AES and Southern filed applications with FERC seeking certificate authorization under Natural Gas Act (NGA) section 7(c), 15 U.S.C. § 717f(c), to construct and operate interstate natural gas pipeline facilities to transport LNG into the Market Area by interconnecting with Florida Gas' pipeline. Meanwhile, AES attempted to negotiate an interconnection agreement with Florida Gas to allow AES to connect its proposed LNG pipeline to Florida Gas' pipeline. After negotiations broke down, AES filed a complaint with FERC, initiating the *AES v. FGT* proceeding. FERC ordered a hearing pursuant to NGA section 5, 15 U.S.C. § 717d, which eventually led to the orders challenged here.

At various points in these proceedings, Florida Power intervened to raise concerns that introducing LNG into the Market Area could damage its turbines, including thirty-two that employ a Dry Low Nitrogen Oxide (DLN) combustion system. Florida Power was worried that fluctuations in gas composition caused by LNG would damage its DLN turbines. Florida Power therefore requested FERC establish gas quality standards that would protect its DLN turbines. In the alternative, Florida Power suggested FERC could assign

Florida Power's mitigation costs caused by LNG to the upstream parties responsible for introducing LNG to the Market Area.

Acknowledging Florida Power's concerns about adverse impacts on its turbines, FERC promised to address the issue in the *AES v. FGT* proceeding. The Commission also conditioned approval of Southern's LNG project and the AES and Florida Gas interconnection agreement on the parties meeting the gas quality and interchangeability standards to be set in that proceeding. To the outside observer, it appeared FERC would exercise its section 5 authority in the *AES v. FGT* proceeding to remedy Florida Power's concerns.

On April 20, 2007, the Commission issued its order in the *AES v. FGT* proceeding, *AES Ocean Express LLC v. Fla. Gas Transmission Co.*, 119 F.E.R.C. ¶ 61,075 (Apr. 20, 2007) (*Initial Order*), and on December 20, 2007, the Commission issued an order on rehearing, *AES Ocean Express LLC v. Fla. Gas Transmission Co.*, 121 F.E.R.C. ¶ 61,267 (Dec. 20, 2007) (*Order on Rehearing*) (together the *Orders*). In the *Orders*, FERC ruled Florida Gas' revised tariff was "just and reasonable" and that FERC lacked jurisdiction to assign Florida Power's mitigation costs to non-jurisdictional upstream parties, including Southern and AES. Furthermore, the Commission stated it would be inappropriate to consider Florida Power's mitigation costs in any future Florida Gas proceeding. Florida Power petitioned this court for review.

II

One troubling aspect of the *Orders* is that they highlight FERC's dereliction of its section 7 duty to balance public benefits and adverse effects.

NGA section 7 requires a company seeking to construct new gas facilities to seek a certificate of "public convenience and necessity" from FERC. Under NGA section 7(e), "a certificate shall be issued . . . if it is found . . . that the proposed service, . . . operation, construction, [or] extension . . . is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e).

FERC has issued a policy statement interpreting its section 7 authority. *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 F.E.R.C. ¶ 61,227 (Sept. 15, 1999) (*Certificate Policy Statement*). As the Commission explained in AES' section 7 proceeding, the *Certificate Policy Statement* requires FERC to conduct a multi-step analysis to "balance[] public benefits against potential adverse consequences." *AES Ocean Express, LLC*, 103 F.E.R.C. ¶ 61,030 at ¶ 17 (Apr. 10, 2003). First, as a "threshold requirement," the Commission must ensure the proposed project will not be subsidized by existing customers. *Id*. ¶ 18. Then, the Commission must "determine whether the applicant has made efforts to eliminate any adverse effects the project might have on the applicant's existing customers." *Id*. Next, the Commission will consider "potential impacts of the proposed project on other pipelines in the market [and] those existing pipeline's captive customers." *Id*. ¶ 19. Finally, "[i]f residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects." *Id*. "This is essentially an economic test." *Id*. The Commission will proceed with the section 7 certificating process "[o]nly when the [public] benefits of the proposal outweigh the adverse effects on other economic interests." *Id*.

Ever since Southern filed a section 7 application and AES sought to interconnect to Florida Gas' pipeline, Florida Power has diligently raised its concerns with FERC about the adverse effects that introducing LNG into the Market Area could have on its DLN turbines. *See AES Ocean Express LLC v. Fla. Gas Transmission Co.*, 107 F.E.R.C. ¶ 61,276 at ¶¶ 14–18 (June 18, 2004); *S. Natural Gas Co.*, 113 F.E.R.C. ¶ 61,199 at ¶¶ 17–21 (Nov. 22, 2005). Instead of addressing Florida Power's concerns in Southern's section 7 proceeding, however, FERC deferred consideration of the issue to the *AES v. FGT* section 5 proceeding.[1]

FERC employed a similar tactic when issuing its new *Policy Statement on Provisions Governing Natural Gas Quality and Interchangeability in Interstate Natural Gas Pipeline Company Tariffs*, 115 F.E.R.C. ¶ 61,325 (June 15, 2006) (*2006 Policy Statement*). Florida Power had submitted comments to FERC about the policy statement, presumably expressing similar concerns to those it had raised in the Southern and AES proceedings. At the conclusion of the *2006 Policy Statement*, FERC again postponed consideration of the issue:

> Some commenters ask the Commission to impose specific obligations on LNG project developers regarding merchantability, identification of adverse impacts, compensation for negative impacts, and mitigation.

---

[1] The Commission initially found in AES' section 7 proceeding that "[b]ecause [AES] is a new company proposing a new project, the potential for one class of customers to financially subsidize or to adversely impact another is not present." *AES Ocean Express, LLC*, 103 F.E.R.C. ¶ 61,030 at ¶ 20 (Apr. 10, 2003). However, the adverse effects issue was resurrected in the *AES v. FGT* proceeding when AES sought to interconnect its pipeline with Florida Gas' pipeline.

> However, the Commission believes that these are issues that should be addressed, if and when problems are identified, in specific cases.

*Id.* ¶ 47 (footnote omitted). Thus, as in the Southern section 7 proceeding, FERC's *2006 Policy Statement* again deferred consideration of adverse effects and mitigation costs to another day.

Yet, when FERC finally reached the *AES v. FGT* proceeding—the "specific case" it claimed to have been waiting for—it summarily dismissed the potential adverse effects of LNG on Florida Power's turbines. FERC variously described Florida Power's mitigation costs as "not . . . beyond ordinary business costs that could be expected in operating sophisticated equipment with special needs as to the fuel it burns," *Initial Order* ¶ 56, not "significant," *id.* ¶ 61, "speculative and indefinite," *id.* ¶ 266, and "not so excessive as to render Florida Gas's proposed standards unjust and unreasonable," *Order on Rehearing* ¶ 80. At oral argument, FERC's counsel repeated this cryptic assessment: "[T]he Commission said [the costs] are speculative, but we know what kinds of costs we're looking at, and we just don't find them to be that . . . significant." Tr. of Oral Argument at 27:19–23.

In the *Order on Rehearing*, FERC asserted that it properly considered the public interest. *Order on Rehearing* ¶¶ 106–07. FERC claimed its responsibility to consider the public interest "is related to the development of plentiful supplies of natural gas at reasonable prices [and] [t]he Commission properly considered these factors in issuing the certificates that will promote increased supplies in the regions served by Florida Gas." *Id.* ¶ 107. FERC candidly revealed its view that Florida Power and other similarly situated parties

"have not explained how the public interest, as opposed to their interests, would be served by allocating their costs to upstream entities not subject to our jurisdiction, even if the Commission had the authority to do so." *Id.*

As FERC itself has noted, its section 7 duty to consider the public interest is broader than promoting a plentiful supply of cheap gas, as important as that policy may be. And although FERC determined that the introduction of LNG would serve the public interest by increasing gas supplies, it does not follow inexorably that Florida Power's customers should pay the cost of the adverse effects of the expansion. Rather, FERC must ensure "the [public] benefits of the proposal outweigh the adverse effects on other economic interests." *AES Ocean Express, LLC*, 103 F.E.R.C. ¶ 61,030 at ¶ 19. While "[t]here is no dispute that the 'public interest' standard of NGA § 7 is less exacting than the 'just and reasonable' requirement of § 4 . . . both the Supreme Court and this circuit have made clear that the Commission has a duty to use its § 7 power to protect consumers." *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1070 (D.C. Cir. 2003) (citation omitted). Here, FERC neglected that duty.

We have long held FERC's section 5 burden is two-fold: "We will not approve a rate formulated by FERC unless the Commission has shown (i) that the proposed and rejected rate is unjust and unreasonable and (ii) that its alternative formulation is just and reasonable." *Complex Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992, 1003 (D.C. Cir. 1999). An important part of the Commission's duty is "to examine the cost-shifting effect of its orders." *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1315 (D.C. Cir. 1991). FERC therefore cannot establish its order is just and reasonable if it "fail[s] to make findings as to the impact the [order] would actually have on ultimate consumers." *Id.*

(second alteration in original). FERC acknowledged this obligation in the *Initial Order*, explaining that "the gas quality and interchangeability standards that are adopted in this proceeding must facilitate increased access to LNG supplies, and ensure that the introduction of LNG into Florida Gas' system will have no detrimental impact on the pipeline or its customers." *Initial Order* ¶ 8.

Before the Commission, Florida Power argued that if FERC approved Florida Gas' revised tariff, Florida Power would incur mitigation costs adjusting its turbines to handle wider fluctuations in gas quality. Thus, to properly assess the impact of its orders and fulfill its section 5 burden, FERC was obligated to examine Florida Power's mitigation costs.

In reviewing the evidence submitted by the parties, FERC acknowledged "there may be some costs associated with retuning or re-centering the turbines." *Initial Order* ¶ 56 (footnote omitted). FERC stated those costs could be as little as $100,000. *Id*. ¶ 57. However, FERC also noted that "for some turbines (and none have been specifically identified in this proceeding) not all the equipment necessary for a turbine to operate within [the gas quality range] may be in place." *Id*. ¶ 60. For those turbines, the costs could be over $1 million each. *Id*.

Rather than considering whether it was just and reasonable for a Florida Gas customer, such as Florida Power, to incur these mitigation costs, FERC simply declared, "None of the costs identified in the record are significant." *Id*. ¶ 61. This is perplexing. Florida Power owns thirty-two DLN turbines. *Id*. ¶ 112. As Florida Power notes in its brief to this court, its mitigation costs, by FERC's calculation, could total $32 million. Br. of Pet'r Florida Power at 16. At another point in the *Initial Order*, FERC stated the mitigation costs

were between $100,000 and $1.5 million. *Initial Order* ¶ 130. At the high end of this estimate, it appears the "minor mitigation measures," *id*., described by the Administrative Law Judge could cost Florida Power $48 million.

In an era where we speak nonchalantly of trillions of dollars, costs in excess of $40 million may indeed be trivial. But we cannot know this without a frame of reference. Florida Power reaps no profits from the introduction of LNG. Why is it just and reasonable for Florida Power to pay mitigation costs caused by upstream parties that retain the profits without receiving a corresponding benefit? Other than claiming it lacks jurisdiction, FERC does not explain. Ordinarily, FERC is careful to avoid cross-subsidization, yet the *Orders* would appear to have this effect. FERC's blanket statement that the costs in the record are not "significant" does not satisfy its burden to establish just and reasonable rates.

FERC concluded that, "based upon the manufacturers' specifications, [Florida Power] can operate [its] turbines using gas with the Wobbe Index range variability allowed by Florida Gas' proposed standard, without incurring costs beyond what can reasonably be expected in operating sophisticated equipment with special needs as to the fuel it burns." *Id*. ¶ 63. FERC cannot be suggesting Florida Power will not incur any mitigation costs, or it would say so. Instead, FERC appears to be suggesting the costs should not surprise Florida Power because DLN turbines, like luxury sedans, are expensive to own and maintain. But presumably DLN turbines, like luxury sedans, may be damaged by the fuel their owners fill them with if the fuel is not of the proper quality. Once again, FERC fails to square its analysis with its obligation to "make findings as to the impact the [order]

would actually have on ultimate consumers." *Algonquin Gas Transmission Co.*, 948 F.2d at 1315 (alteration in original).

## III

After finding Florida Gas' revised tariff just and reasonable, FERC could have called it a day. But it went a step further, announcing, "[O]nce the Commission has considered those contentions [about the pipeline's standards placing excessive cost burdens on existing customers], and approved just and reasonable gas quality and interchangeability standards, the Commission will not act further to provide for the recovery of any mitigation costs incurred by non-jurisdictional downstream gas users." *Initial Order* ¶ 261. FERC thus declared, "[N]o mechanism should be established in this proceeding . . . to recover any costs [Florida Power] may incur as a result of the introduction of LNG into the Florida Gas system [and] the Commission further finds that no such mechanism should be established in any future Florida Gas proceeding." *Id.*

FERC may be correct on the narrow conclusion that it lacks jurisdiction to assign mitigation costs directly to non-jurisdictional entities. However, FERC does not suggest, and there is no reason to believe, this prevents FERC from providing Florida Power with *some* relief. FERC and the court today rely too heavily on *American Gas Ass'n v. FERC*, 912 F.2d 1496 (D.C. Cir. 1990), where we stated: "The Commission may not use its § 7 conditioning power to do indirectly (1) things that it can do only by satisfying specific safeguards not contained in § 7(e) (in the case of reducing previously approved jurisdictional rates, by meeting its burden under § 5), or (2), *a fortiori*, things that it cannot do at all." *Id.* at 1510 (citations omitted).

The proper question is not what FERC is prohibited from doing "at all," but whether FERC reneged on its commitment to protect consumers from the cost-shifting effect of its orders—a task well within the Commission's powers. As FERC finally admits on rehearing, it had sufficient section 7 conditioning authority that its conditions for allowing LNG into the Market Area "could have the effect of inducing the LNG Suppliers or other upstream parties to install some degree of processing capability in order to increase the amount of LNG supplies which can satisfy Florida Gas's approved gas quality standards." *Order on Rehearing* ¶ 104. FERC had jurisdiction to get the job done; it simply declined to employ its power to remedy the adverse effects of LNG on Florida Power's DLN turbines.

FERC's bold claim with regard to section 5 is that, once it has made the just and reasonable determination, the issue of mitigation costs is forever closed. This conclusion seems suspect. It is clear from the record that no one was certain what the impact of allowing LNG into the Market Area would be—not the experts who testified at the hearing, not Florida Power, not the Administrative Law Judge, and certainly not FERC. If Florida Power were to incur substantial mitigation costs in the future, it would appear Florida Gas' rates could become so unjust and unreasonable FERC would be required to act. Section 5 is not frozen in time, and neither is FERC's burden under it.

Finally, I note the Commission may be impermissibly attempting, once again, to dilute its burden of proof under section 5. Relying on *ANR Pipeline Co.*, 109 F.E.R.C. ¶ 61,138 (Nov. 3, 2004), the Commission stated, "[T]o the extent the pipeline's section 5 proposal [i]s just and reasonable, the Commission would approve it even if other just and reasonable remedies might exist." *Initial Order* ¶ 25

(footnote omitted). Over objections, the Commission stated this "deference [to Florida Gas] was appropriate." *Id.* ¶ 26. Under section 4, the pipeline bears the burden of proof. Under section 5, FERC does. We often have rejected FERC's attempts to shift its section 5 burden, and this appears to be another such case. *See W. Res., Inc. v. FERC*, 9 F.3d 1568, 1577–79 (D.C. Cir. 1993).

\* \* \*

After FERC promised it would address Florida Power's concerns about adverse effects to its turbines in the *AES v. FGT* proceeding, it reversed course, giving little credence to Florida Power's mitigation costs and concluding it lacked jurisdiction to address the issue now or in the future. In doing so, FERC failed to fulfill its section 7 duty to find the LNG projects were in the public interest and failed to satisfy its section 5 burden to establish the revised tariff was just and reasonable. Throughout this process FERC has said one thing and done another. It has kept Florida Power running toward an ever-receding dream of remediation. FERC's decisions are entitled to a great deal of deference. The court grants such deference here. FERC wins. But being bested in a game where the winner not only writes the rules but is permitted to constantly change them is the definition of arbitrariness.