**JIM WALTER RESOURCES, INC., Petitioner,**

v.

**SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION and Federal Mine Safety and Health Review Commission, Respondents.**

No. 95–1554.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1996.

Decided Jan. 17, 1997.

David M. Smith, Washington, DC, with whom Warren B. Lightfoot, Jr., Birmingham, AL, was on the briefs, argued the cause, for petitioner.

Colleen A. Geraghty, Attorney, Arlington, VA, U.S. Department of Labor, with whom J. Davitt McAteer, Acting Solicitor of Labor, Sheperds Town, WV, and W. Christian Schumann, Counsel, Washington, DC, were on the brief, argued the cause, for respondents. Elizabeth Ebner, Washington, DC, and Norman M. Gleichman, Takoma Park, MD, entered appearances, for respondents.

Before HENDERSON and RANDOLPH, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the court filed by Senior Circuit Judge BUCKLEY.

BUCKLEY, Senior Circuit Judge:

Petitioner Jim Walter Resources, Inc. seeks review of the Federal Mine Safety and Health Review Commission's Decision and Order finding that Jim Walter violated the mandatory health standards established in 30 C.F.R. § 72.630(a) and that the violation constituted an "unwarrantable failure" to comply with the standards. We uphold the Commission's determination that Jim Walter violated section 72.630(a) but reject its finding that the violation constituted an unwarrantable failure to comply with the regulation.

## I. BACKGROUND

### A. Legal Framework

The Federal Mine Safety and Health Act of 1977 ("Act"), 30 U.S.C. § 801 *et seq.* (1994), was enacted to improve and promote health and safety in the Nation's mines. *See id.* § 801. Section 104(a) of the Act directs the Secretary of Labor ("Secretary") or his authorized representative to issue a citation to a mine operator if, upon inspection or investigation, he believes that the operator has violated a mandatory health or safety standard established under the Act. *Id.* § 814(a).

The health standard at issue in this case is 30 C.F.R. § 72.630, which provides, in its entirety, as follows:

## § 72.630  Drill dust control at underground areas of underground mines.

(a) Dust resulting from drilling in rock shall be controlled by use of permissible dust collectors, or by water, or water with a wetting agent, or by ventilation, or by any other method or device approved by the Secretary that is as effective in controlling the dust.

(b) *Dust collectors.* Dust collectors shall be maintained in permissible and operating condition. Dust collectors approved under Part 33—Dust Collectors for Use in Connection with Rock Drilling in Coal Mines of this title or under Bureau of Mines Schedule 25B are permissible dust collectors for the purpose of this section.

(c) *Water control.* Water used to control dust from drilling rock shall be applied through a hollow drill steel or stem or by the flooding of vertical drill holes in the floor.

(d) *Ventilation control.* To adequately control dust from drilling rock, the air current shall be so directed that the dust is readily dispersed and carried away from the drill operator or any other miners in the area.

30 C.F.R. § 72.630 (1996).

A violation of section 72.630 occurs when a miner is located downwind of a drilling operation that fails to employ one of the three alternative methods of dust suppression specified in the regulations: approved dust collectors, water, and ventilation. Because workable dust collectors were not available for Jim Walter's pneumatic drills, it had to rely on either water or ventilation to control rock dust.

B.  Events Relating to the Violation of Section 72.630(a)

Jim Walter owns and operates an underground coal mine, known as the "Number 4 mine," in Birmingham, Alabama. The coal is extracted through "longwall mining," which we have described as follows:

A longwall panel is created by digging two parallel, vertical tunnels (the headgate and tailgate entries) and a third horizontal connector (the longwall). The ceiling of the longwall exposes the face of rock from which coal will be extracted by a shearer moving back and forth across the face. Mining begins at the bottom of the parallel entries and progresses back towards ground level.

*International Union, United Mine Workers of America v. FMSHA,* 931 F.2d 908, 910 (D.C.Cir.1991) (internal quotation marks and citations omitted). After the miners have finished mining a section, they engage in longwall recovery, that is, removal of longwall equipment from one area so that they can begin mining another longwall panel at a different location. During this process, it is necessary to install roof bolts to support the mine roof so that the equipment may be removed.

The Jim Walter miners work three shifts: an "owl shift" that runs from 11:00 p.m. to 7:00 a.m.; a "day shift" from 7:00 a.m. to 3:00 p.m.; and an "evening shift" from 3:00 p.m. to 11:00 p.m. During the day shift on July 21, 1994, an inspector from the Mine Safety and Health Administration ("MSHA"), Gary Don Greer, conducted an inspection of the Number 4 mine while the miners were engaged in longwall recovery. Greer was accompanied on his inspection by a representative of management and Glynn Loggins, the United Mine Workers of America's ("UMWA") representative on the Number 4 mine safety committee. Loggins told Greer that the union was having problems with management concerning the drilling of rock along the longwall face upwind of miners. Greer replied that he would look into the problem. Loggins also informed the inspector that it was likely that a "section 103(g)" complaint would be filed concerning the conditions faced by the downwind miners. Section 103(g) enables a miner or a representative of the miners to obtain an "immediate inspection" by notifying the Secretary or his authorized representative of a violation that he "has reasonable grounds to believe ... exists." 30 U.S.C. § 813(g).

During the course of his inspection, Greer discussed the three approved ways of complying with section 72.630(a) with the longwall foreman and saw him connect one of Jim Walter's drills to water. After observing the

water-equipped drill in operation, the inspector asked the operator whether he had encountered any problems with it. He answered that he had not.

When Greer reached the surface of the mine, he received a message directing him to call the MSHA Sub–District office. When he called, he was told that the MSHA had received a section 103(g) complaint asking for an inspection of the Number 4 mine. The complaint stated that on July 20–21, 1994, drills were operated upwind of other miners without the use of any method of dust suppression. The complaint also reported that management and some drill operators were concerned that problems encountered with the use of water in the drilling would create a hazard; and it requested that, in the event Jim Walter decided to drill with water, an inspection of the "roofbolting" be made to determine whether the use of water presented an imminent danger. 103(g) Complaint (July 21, 1994), *reprinted in* App. Tab 9.

The next day, July 22, 1994, Greer gave a copy of the 103(g) complaint to Jim Walter officials and interviewed persons who had information regarding the July 21 owl shift (i.e., 11:00 p.m. on July 20 to 7:00 a.m. on July 21). Greer testified that, in the course of these interviews, he was informed that the miners had used drills to install roofbolts; that they had as many as four drills in operation at a time; that they would have used more drills had they not kept breaking down; and that broken drills were being sent out to be repaired and then returned so as to maintain as many drills in operation as possible. He also stated that he had asked Jeffrey Maddox, the longwall manager, whether he knew that the drills should be provided with water, and that Maddox replied that he did, but that "they were in a hurry, due to bad roofing conditions, and they thought that [the use of] water would create a [safety] hazard." Transcript of Hearing held January 31, 1995 Before Administrative Law Judge ("Tr.") at 96. Finally, Greer testified that when he observed drilling during the July 21 day shift, the use of water did not appear to be creating a hazard. *Id.*

Immediately following these conversations, Greer issued an order, pursuant to section 104(d)(2) of the Act ("(d)(2) order"), 30 U.S.C. § 814(d)(2), in which he found that Jim Walter had violated 30 C.F.R. § 72.630(a). He determined that

dust resulting from drilling in rock was not being controlled by use of permissible dust collectors or by water, or water with a wetting agent, or by ventilation controls. Employees who were drilling the No.1 longwall section roof with pneumatic rotation drills on 7-21-94 owl shift were exposed to this dust while installing permanent roof supports. As many as four (4) drills were in operation at any one time and none of the drills were equipped with dust suppression devices.

Mine Citation/Order No. 3184217 (July 22, 1994), *reprinted in* App. Tab 10. The (d)(2) order also indicated that injury or illness was "highly likely"; that the injury or illness could reasonably be expected to be "permanently disabling"; that the violation affected eight people; and that the violation was "significant and substantial." *Id.*

Jim Walter contested the (d)(2) order; and on January 31, 1995, a hearing was held before an administrative law judge ("ALJ"). On August 23, 1995, the ALJ found that Jim Walter had violated section 72.630(a), *Jim Walter Resources, Inc. v. Secretary of Labor, MSHA,* 17 F.M.S.H.R.C. 1423, 1446 (1995); that the violation, albeit serious, was not "significant and substantial," *id.* at 1448; and that it was the result of Jim Walter's "unwarrantable failure to comply" with the health standard established by the regulations. *Id.* at 1450. Jim Walter's subsequent petition for review and motion for reconsideration were denied.

## II. DISCUSSION

In reviewing the ALJ's decision, we must uphold his findings of fact "if supported by substantial evidence on the record considered as a whole." 30 U.S.C. § 816(a)(1); *Chaney Creek Coal Corp. v. FMSHRC,* 866 F.2d 1424, 1431 (D.C.Cir.1989) (citations omitted). "Our only task in reviewing substantial evidence questions is to determine whether there is such relevant evidence as a reasonable mind might accept as adequate to

support the judge's conclusion." *Id.* (citations, internal quotation marks, and brackets omitted). We defer to the Secretary's interpretation of his regulations unless it is "clearly erroneous." *Energy West Mining Co. v. FMSHRC,* 40 F.3d 457, 462 (D.C.Cir.1994) (citing *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965)).

### A. Violation of Section 72.630(a)

■ Jim Walter challenges the ALJ's finding that it violated section 72.630(a) on three grounds. It maintains, first, that Greer was required to take air or dust samples before issuing the (d)(2) order; second, that the ALJ's determination is not supported by substantial evidence because Keith Burgess's testimony was discredited on cross-examination; and third, that it actually used water during the July 21 owl shift.

#### 1. Inspector Greer's Failure to Take Air or Dust Samples

Jim Walter contends that the commentary to 30 C.F.R. § 72.630, *see Air Quality: Health Standards for Abrasive Blasting and Drill Dust Control,* 59 Fed.Reg. 8318, 8324–25 (1994), required Greer to take air or dust samples or to measure Jim Walter's air volume before issuing the (d)(2) order. The relevant portion of the commentary provides, with specific reference to section 72.630(d), that

MSHA will continue to determine compliance with this requirement under the final rule as it has enforced § 70.400–3; i.e., through the measurement of air quantity or other measures set forth in a mine's ventilation and methane and dust control plan.

*Air Quality,* 59 Fed.Reg. at 8325.

We have several problems with this argument: First, because section 72.630(d) deals exclusively with the use of *ventilation* to control rock dust, it is clear that the commentary is referring to methods for determining the efficacy of ventilation in controlling dust. Second, as the ALJ observed, neither the Secretary's Program Policy Manual (the official repository of the Secretary's interpretation of the regulations and of his enforcement practices) nor the regulations contain a single reference to air measurements or the collection of dust samples. *Jim Walter Resources,* 17 F.M.S.H.R.C. at 1444. Finally, we note that the sentence immediately following the passage on which Jim Walter relies reads as follows: "MSHA does not intend that exposure samples be the routine method of determining compliance with this paragraph." *Air Quality,* 59 Fed.Reg. at 8325. Thus, the commentary itself explicitly recognizes that the taking of samples is not a prerequisite for determining whether section 72.630(a) has been violated.

#### 2. Keith Burgess's Testimony

■ One of the Secretary's key witnesses was Keith Burgess, who worked during the July 21, 1994, owl shift. The ALJ's decision relied heavily on his testimony to establish the existence of a violation:

Burgess' first hand testimony establishes the violation. Burgess worked on the owl shift, and I accept his assertion that drilling took place during the entire shift. I also accept his testimony that as many as four drills were used at one time, that the first was located at the headgate and the others were located downwind, along the longwall. In this regard, I note his assertion that when he "stood back," he saw more than two drills in operation, and that none was fitted with water. The fact that water was not used is also attested by Burgess' statement that he saw dust coming toward him from an upwind drill, and by his testimony that [he was told that] the respirators were a replacement for using water when drilling.

*Jim Walter Resources,* 17 F.M.S.H.R.C. at 1443 (citations omitted).

Jim Walter argues that the ALJ ignored most, if not all, of Burgess's cross-examination testimony. Specifically, it contends that although Burgess testified on direct examination that he saw four drills operating simultaneously, on cross-examination he admitted that only two drills were operable. Jim Walter's interpretation, however, is not supported by the transcript. On cross-examination, Burgess testified that when the owl shift crew arrived, two functioning drills and

one or two non-functioning drills were at the site in addition to the two drills that the owl shift crew brought with them—for a total of five or six drills, of which four were operable. Tr. at 197.

Jim Walter also maintains that Burgess admitted on cross-examination that while operating his drill, he never observed any others in operation. The company takes the statement out of context. Although Burgess testified that he could not see any other drills when he was operating his own, he also stated that when he was not engaged .in drilling (i.e., when his attention was not focused on his own work), he could see "more than one drill operating." Thus, while it may have been gilding the lily for the ALJ to find that as many as four drills were in operation at the same time, substantial evidence clearly supported the conclusion that two or more drills, at least one of which was located downwind from another, were operating simultaneously, which was all that was required to support the finding of a violation.

### 3.   Use of Water During the Owl Shift

In challenging Greer's statement, in the (d)(2) order, that "none of the drills were equipped with dust suppression devices," Jim Walter points out that Greer actually saw drilling with water on the morning of July 21 and that the production reports . reveal that water was being used on the drills during the shifts preceding the July 21 owl shift. Jim Walter then argues that because water was used before and after the July 21 owl shift, the drills must have been at least ·*equipped* for the use of water during the owl shift, even if none was used, because the drills could not have been so rigged between the end of the owl shift and Greer's arrival at the start of the next one. Although Jim Walter charges the inspector with perjury, we are inclined to find its objections little more than a quibble. A fair reading of the (d)(2) order is that none of the drills *employed* water during the owl shift. Jim Walter does not seriously contest the key finding that substantial drilling occurred during that shift without the use of dust suppressors.

### B.   "Unwarrantable Failure"

■   Section 104(d)(1) of the Act provides, in relevant part, that

[i]f, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, ... and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this chapter.

30 U.S.C. § 814(d)(1). A finding of an unwarrantable failure is a condition precedent for the issuance of a "withdrawal order" under this subsection, i.e., an order that the operator withdraw· personnel from the area affected by the violation until `a representative of the Secretary finds that the violation has been abated. *Id.* Section 104(d)(2) provides for the issuance of an additional order, i.e., a (d)(2) order, should a subsequent inspection of the same mine reveal similar violations. *Id.* § 814(d)(2).

The Commission has defined "unwarrantable failure" as "aggravated conduct, constituting more than ordinary negligence, by a mine operator in relation to a violation of the Act." *Emery Mining Corp. v. Secretary of Labor, MSHA,* 9 F.M.S.H.R.C.1997, 2004 (1987). It is characterized by "indifference," "serious lack of reasonable care," "reckless disregard," or "intentional misconduct." *Cyprus Plateau Mining Corp. v. Secretary of Labor, MSHA,* 16 F.M.S.H.R.C. 1610, 1615 (1994) (citations omitted). If an operator reasonably, but erroneously, believes in good faith that the cited conduct is the safest method of compliance with the applicable regulations, its actions will not constitute aggravated conduct that exceeds ordinary negligence. *Id.*

The ALJ determined that Jim Walter's violation on the July 21 owl shift constituted an unwarrantable failure to comply with the standards, *Jim Walter Resources,* 17 F.M.S.H.R.C. at 1449–50, and rejected its argument that it had been trying diligently to comply with section 72.630(a) and would have but for problems it had encountered with its drills and the condition of the mine's

roof. *Id.* at 1450. Jim Walter contends that this finding is not supported by substantial evidence because the ALJ ignored the undisputed testimony of Jim Walter's witnesses that the company went to great lengths to develop a water-equipped drill in order to comply with section 72.630(a) but that compliance on the July 21 owl shift was not feasible due to the poor condition of the roof that the miners were required to drill during that shift.

Jim Walter first learned that the Secretary intended to apply section 72.630 to longwall mining in March 1994, when it received two citations for failing to control rock dust adequately with ventilation. At that time, portable drills of the kind employed by Jim Walter for such operations were not equipped to use water. Those drills, which weighed about 150 pounds and were carried by two persons, were equipped with hollow "drill steels" that connected the drill to the drilling bits. Pressurized air injected through the steels rotated the bits, which, in turn, generated rock dust that, unless wetted down or otherwise suppressed, would be injected into the air of the mine as a visible cloud.

The hearing record shows that following the issuance of the March 1994 citations, Jim Walter proceeded to test various ways of adapting its drills for the use of water for dust suppression, but none of these proved successful. For example, when it ran water through one type of steel, it tended to drill curved holes into which roof bolts could not be inserted; when another kind was used, dispersed water caused the steel to "hang" in the rock if the drill hit a crack, which the miners had difficulty withdrawing. Tr. at 278. Following these initial failures, Jim Walter worked with the distributor of its drills to develop a system in which the water would flow through the handle of the drill. Tr. at 279. After initial setbacks, an alternative method was devised that ran water from the drill head through the steel. Tr. at 280.

Six of these modified drills were delivered to the Number 4 mine on July 19, 1994, in time to be used in the longwall recovery operation. The miners found, however, that the drills were operable for only short periods. During the evening shift of July 20, a miner reported that the water was "tearing the [drill] heads up" and that rock was falling from the roof. Tr. 283–84. Because the drills were not functioning properly, the miners had difficulty inserting pins into the roof. Maddox, the longwall manager, testified that Jim Walter then contacted the distributor and asked for delivery of the additional drills that Jim Walter had been holding in reserve. These were brought into the mine, and the damaged drills were returned to the distributor for repair. Even when the drills were working, water hindered the miners' vision and dispersed in the cracks that were encountered in this section of the roof, which caused the drill steels to get stuck in the roof. Jim Walter concluded that to continue injecting water into this "bad top" would create a new hazard as the roof became heavier and more likely to fall. The severity of the hazard facing Jim Walter is not diminished by the fact that Greer observed miners successfully drilling with water on the shift immediately following the July 21 owl shift because the condition of the roof in this type of operation is extremely variable.

None of this testimony was disputed. In fact, the poor condition of some of the roof being drilled during the July 21 owl shift was corroborated by Burgess. Tr. at 199. Greer himself testified that "bad top" is "scary," Tr. at 138; and the employees' 103(g) complaint confirmed that some drill operators as well as management were concerned that "if water was used in the drill, the drill steels will not work properly and would creat [sic] a hazard." Nevertheless, rather than rely on any of this evidence, the ALJ concluded that Jim Walter had not tried "diligently to comply" with section 72.630(a). *Jim Walter Resources,* 17 F.M.S.H.R.C. at 1450. He reasoned that

> [i]f, in fact, Jim Walter was having compliance problems, it is logical that this would have been explained to Greer. It was not, and Maddox's excuse—that Greer did not ask about the problems—strains credulity given the consequences of Jim Walter's indifference.

*Id.* (citations to hearing transcript omitted). As the ALJ acknowledged, however, Maddox also testified that when he saw that Greer

was writing the (d)(2) order, he became angry and abruptly ended the meeting. *Id.* at 1441.

Whatever the reason for Maddox's silence on the matter, his failure to detail the compliance problems Jim Walter had encountered was not a sufficient reason for ignoring the uncontradicted evidence that the company had in fact worked diligently to develop a method for using water with portable drills, had brought six water-equipped drills into the mine for no discernible reason other than an intent to suppress the dust, and had abandoned their use only after running into mechanical problems and encountering conditions with the roof that caused at least some of the miners to fear for their safety. This evidence trumped whatever inference might fairly be drawn from Maddox's failure to explain the company's inability to comply with the regulation.

Accordingly, we conclude that the ALJ's finding of "unwarrantable failure" is not supported by substantial evidence. Having made that determination, we need not address Jim Walter's argument that 30 U.S.C. § 814(d) only authorizes such a finding when accompanied by a violation that could "significantly and substantially" contribute to a safety or health hazard; nor need we determine whether the company's Petition for Discretionary Review and Motion for Reconsideration were properly denied.

### III. CONCLUSION

For the reasons stated, we affirm the Commission's determination that there was a violation of 30 C.F.R. § 72.630(a) but reverse its finding that the violation was caused by an "unwarrantable failure to comply." The case is remanded for further action consistent with this opinion.

*It is so ordered.*