# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 4, 2011          Decided June 10, 2011

No. 10-1280

PERFORMANCE COAL COMPANY,
PETITIONER

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
AND SECRETARY OF LABOR,
RESPONDENTS

On Petition for Review of an Order
of the Federal Mine Safety and Health Review Commission

*Patrick J. Slevin* argued the cause for petitioner. With him on the briefs were *Peter S. Gould*, *Robert D. Luskin*, and *Benjamin D. Wood*.

*Edward Waldman*, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief was *W. Christian Schumann*, Counsel. *John T. Sullivan*, Attorney, Mine Safety and Health Review Commission, entered an appearance.

Before: SENTELLE, *Chief Judge*, GINSBURG and BROWN, *Circuit Judges*.

BROWN, *Circuit Judge*: Pursuant to § 105(b)(2) of the Federal Mine Safety and Health Act of 1977 ("the Mine Act"), 30 U.S.C. § 815(b)(2), Performance Coal Company ("Performance Coal") petitioned the Federal Mine Safety and Health Review Commission ("the Commission") for temporary relief from restrictions the Mine Safety and Health Administration ("MSHA") imposed on it. The Commission denied that relief. But we grant Performance Coal's petition for review because the Commission's interpretation of § 105(b)(2) is simply untenable.

I

This case is the product of catastrophic facts. On April 5, 2010, a mine disaster occurred in Performance Coal's Upper Big Branch Mine in West Virginia. Tragically, twenty-nine miners lost their lives. Within hours of the explosion, MSHA, acting pursuant to its statutory authority, issued an order seizing control of the mine in an attempt "to insure the safety of any person in the coal . . . mine . . . ." 30 U.S.C. § 813(k) (§ 103(k) of the Mine Act).[1]

MSHA's original order focused on the rescue of trapped miners; it required Performance Coal to secure the Secretary of Labor's approval before taking any action to recover or restore

---

[1] The Mine Act is codified at 30 U.S.C. § 801 *et seq.* In referring to its various provisions, we will use the Mine Act's numbering, although citations themselves are to the U.S. Code. We note, however, that the Mine Act references and their U.S. Code counterparts are readily interchangeable because Mine Act provisions are numbered § 10X and U.S. Code sections are numbered § 81X, with the "X" being the same in both versions. For example, § 103(k) in the Mine Act correlates to § 813(k) in the U.S. Code.

operations in the mine. In the months immediately following MSHA's issuance of the original order, the agency modified that order more than sixty times—first to rescue and recover trapped miners and then to facilitate investigation of the accident site.

When rescue and recovery efforts were completed, Performance Coal, MSHA, and several other entities began preparations for the formal investigation, a process that would entail the collection, examination, and documentation of evidence; the determination of the accident's cause; and the assessment of Performance Coal's potential criminal liability. Because this formal investigation required prolonged underground activity, for several weeks in June 2010, pre-investigation teams surveyed the mine to ensure the site's safety for the formal investigation teams who would travel underground.

Before Performance Coal could begin its formal investigation, however, MSHA again modified the § 103(k) order to incorporate an evidentiary protocol that imposed various restrictions upon Performance Coal, including prohibitions on taking or retaining photographs, collecting and preserving mine dust samples, employing mine mapping technology, and participating in or objecting to any destructive testing of materials gathered underground. Performance Coal objected to these restrictions, arguing that with all of the traffic created by investigatory teams, the accident site was being altered, depriving the company of potentially exculpatory evidence and the opportunity to observe the site.

Performance Coal filed an application with the Commission seeking, *inter alia*, temporary relief from the restrictions pursuant to § 105(b)(2) of the Mine Act, which permits an operator to "file with the Commission a written

request that the Commission grant temporary relief from any modification or termination of any order or from any order issued under section [104] . . . ." 30 U.S.C. § 815(b)(2). The Secretary moved to dismiss Performance Coal's application, arguing in part that § 105(b)(2) does not authorize temporary relief from § 103(k) orders. The Commission set the case for resolution before an administrative law judge (ALJ), who ultimately agreed with the Secretary and denied Performance Coal's request for temporary relief. The ALJ explained her conclusion, noting in particular, "[t]he subject order from which Performance seeks temporary relief was issued under section 103(k) of the Act, and not under section 104, i.e. the only section under which temporary relief may be sought pursuant to [section] 105(b)(2)." *Performance Coal Co. v. Sec'y of Labor, Mine Safety & Health Admin.*, Order Denying Emergency Application to Modify Order and Denying Application for Temporary Relief, *reprinted at* J.A. 346, 1359.

Performance Coal then filed a petition for discretionary review with the Commission. In an order granting discretionary review but denying temporary relief, the Commission held § 105(b)(2) does not offer relief from § 103(k) orders—or from any other order, except one pursuant to § 104. *Sec'y of Labor, Mine Safety & Health Admin. v. Performance Coal Co.*, 32 FMSHRC 811, 815 (2010). Two Commissioners dissented, charging the majority with ignoring the plain and unambiguous language of § 105(b)(2). *Id.* at 820 (Duffy and Young, dissenting). Performance Coal now seeks review from this court.

5

II

A

Before we turn to the interpretive question, we must first address the Secretary's argument that the case is moot—a claim that need not detain us long.

Because MSHA modified the order yet again in December 2010, removing the offending protocols, the Secretary suggests no live controversy remains. Yet that argument ignores the capable-of-repetition-yet-evading-review exception to mootness. Under that exception, if the party seeking to avoid mootness can establish that the duration of the challenged action is too short to be litigated fully before it expires and there is a reasonable expectation the party will be subjected to the same action again, its claims are not moot. *Del Monte Fresh Produce v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009).

Performance Coal easily satisfies the first prong of this exception. This court's jurisprudence recognizes that agency actions which tend to expire within two years are too fleeting to be litigated fully. *Pub. Utils. Comm'n v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001); *see also Del Monte*, 570 F.3d at 322. It is undisputed that § 103(k) orders undergo frequent modifications. In fact, the Secretary does not even address the first prong of this exception, probably because it is a non-starter: in the six weeks immediately following the accident, the initial order went through sixty iterations. The inevitability of future modification certainly places the present controversy within this court's two-year rule for short-lived agency actions.

Instead, the Secretary spends the bulk of her argument attempting to persuade this court that Performance Coal will not again be subjected to any protocols from which it might seek temporary relief. This court has explained, however, that it is not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur[,]" but instead "whether the legal wrong complained of by the plaintiff is reasonably likely to recur." *Del Monte*, 570 F.3d at 324. The question then is not whether Performance Coal will again be subjected to the precise protocols at issue, but whether it will be subjected to further modifications from which it will seek temporary relief.

The Secretary is quick to concede this latter point. As counsel recognized, Performance Coal remains subject to the § 103(k) order, even if not the offending protocols. Or. Arg. 14:54–59. Counsel further admitted it is quite likely MSHA will again modify the § 103(k) order. Or. Arg. 15:22–32. And Performance Coal claims it might well seek temporary relief from a different modification of the § 103(k) order. Given the near certainty of further modifications, it is enough for us to rely on Performance Coal's assertions that it is likely to seek temporary relief from any offending future modification. *See, e.g.*, *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 370–71 (D.C. Cir. 1992) (finding it "reasonably likely" the District would subject the Klan to the same action again based on its leader's own averments, despite the absence of evidence, testimonial or otherwise, that the Klan had express plans to march in the District in the future).

This case is not moot. Indeed, even the Secretary's counsel recognized the near-frivolity of this argument, and made only a half-hearted attempt to persuade us. Or. Arg. 17:03–25. But we understand why counsel would cling to an

anemic claim of mootness because Respondents' statutory argument—to which we now turn—is even weaker.[2]

B

Section 105(b)(2) of the Mine Act provides:

> An applicant may file with the Commission a written request that the Commission grant *temporary relief from any modification or termination of any order or from any order issued under section 814* of this title together with a detailed statement giving the reasons for granting such relief. The Commission may grant such relief under such conditions as it may prescribe, if [certain other conditions are satisfied].

30 U.S.C. § 815(b)(2) (emphasis added). It is the italicized portion of the statute that is at issue in this case.

Applying *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), we conclude Respondents fail at Step One. "When reviewing an agency's construction of the statute it administers, *Chevron* directs the courts first to ask whether Congress has spoken to the specific question at issue. 'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must

---

[2] Although the Commission did not file a brief in this case, the statutory argument the Secretary presents on appeal is almost identical to that contained in the Commission's decision. *See Performance Coal Co.*, 32 FMSHRC 811 (2010). Thus, for purposes of our discussion, we refer to "Respondents" collectively even though we remain mindful of this technicality.

give effect to the unambiguously expressed intent of Congress.'" *Meredith v. Fed. Mine Safety & Health Review Comm'n*, 177 F.3d 1042, 1053 (D.C. Cir. 1999) (quoting *Chevron*, 467 U.S. at 842)). Because congressional intent is best divined from the statutory language itself, resort to legislative history is inappropriate when the statute is unambiguous. *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Thus, to defeat application of a statute's plain meaning, Respondents must "show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996).

Looking at § 105, we have scarcely seen such a "marvel of Congressional clarity," to borrow a phrase from the dissenting Commissioners. *Performance Coal Co.*, 32 FMSHRC at 820 (Duffy and Young, dissenting). In fact, we see no way the statute could be interpreted other than in the manner proffered by Performance Coal. Recall, the statute provides for "temporary relief from any modification or termination of any order or from any order issued under section [104]." 30 U.S.C. § 815(b)(2). Just a plain reading of that text alone satisfies us that the provision is unambiguous. As we read § 105, Performance Coal is entitled to seek temporary relief from a <u>modification</u> or <u>termination</u> *of any order*, including a § 103 order. We struggle to see how Congress could have intended any other reading of the phrase "any order."

Indeed, the dissenting Commissioners identified this very question: "If our colleagues were to assume for argument's

sake that Congress intended to include within the scope of the subsection 'any order,' . . . [how could it] otherwise have secured that objective . . . ?" *Performance Coal Co.*, 32 FMSHRC at 820 (Duffy and Young, dissenting). We likewise find the language Congress selected plain, clear, and simple and we refuse to muddy it by finding ambiguity where none exists.

Respondents argue the term "under section [104]" in the second phrase actually modifies the words "any order" in the first phrase. This is grammatically improbable. The language suggests Congress intended temporary relief to be available not only "from any order issued under section [104]" but also from *all* modifications and terminations (excluding those expressly excepted). Congress's use of the disjunctive "or" to separate modifications and terminations from issuances, and its parallel use of the word "from" to begin each phrase indicates as much. *See In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) (explaining Congress's use of the disjunctive is a persuasive indicator of congressional intent); *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006) (noting that when Congress bifurcated a subsection with the "parallel inclusion of the verb 'exercises' at the beginning of each clause" this was evidence of Congress's intent to avoid "commingl[ing]" of the "textually distinct provisions of the two clauses"). We hold that § 105 means what it says: temporary relief is available from *any* modification or termination of *any* order *or* from any issuance of an order under § 104.

No matter how you parse it, § 105 is a model of near-perfect clarity. Indeed, it is hard to imagine a clearer expression of congressional language. While it may be true that Congress often chooses plausible deniability over linguistic precision, there is no reason to manufacture

ambiguity when, as in this case, the legislative prose is pellucid.

## III

For the foregoing reasons, the petition for review is granted and the Commission's order is set aside.

*So ordered.*