# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 5, 2015           Decided July 31, 2015

No. 14-1206

THE AMERICAN COAL COMPANY,
PETITIONER

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
AND DEPARTMENT OF LABOR,
RESPONDENTS

———

On Petition for Review of a Decision of the
Federal Mine Safety & Health Review Commission

———

*Jason W. Hardin* argued the cause for petitioner. On the briefs was *Kevin N. Anderson*.

*Jerald S. Feingold*, Attorney, Mine Safety & Health Administration, argued the cause for respondent. With him on the brief was *W. Christian Schumann*, Counsel. *John T. Sullivan*, Attorney, entered an appearance.

Before: BROWN, GRIFFITH, and PILLARD, *Circuit Judges*.

GRIFFITH, *Circuit Judge*:

The American Coal Company was cited and fined for a "fire" on one of its coal stockpiles when safety inspectors

from the Mine Safety and Health Administration observed patches of smoldering, smoking coal without visible flames. The Federal Mine Safety and Health Act of 1977 allows the issuance of safety orders and the imposition of citations and fines when a mine operator permits an "accident" to occur in its facility, including a "mine fire." American Coal argues that the citation and fine should be vacated because a "fire," for purposes of the Mine Act, exists only when there are visible flames. The company also contends that even if a fire could exist without visible flames, there was insufficient proof here to show a fire of any kind. We disagree on both points and deny American Coal's petition for review. The statutory term "fire" is ambiguous, the Secretary of Labor reasonably determined that the term does not require the presence of flames, and substantial evidence supports the conclusion that the smoldering patches on American Coal's stockpile satisfied the Secretary's interpretation of a "fire."

I

A

Congress passed the Federal Mine Safety and Health Act of 1977 (the Mine Act), Pub. L. No. 95-164, 91 Stat. 1290 (1977) (codified as amended at 30 U.S.C. § 801 *et seq.*), "to provide more effective means and measures for improving the working conditions and practices" in American mines "in order to prevent death and serious physical harm" to miners. 30 U.S.C. § 801(c). The Mine Act assigned enforcement and other powers to the Secretary of Labor and created within the Department of Labor a new agency, the Mine Safety and Health Administration (MSHA), to administer its provisions. *Meredith v. Fed. Mine Safety & Health Review Comm'n*, 177 F.3d 1042, 1054 & n.12 (D.C. Cir. 1999).

Mine inspectors from MSHA perform frequent, unannounced inspections to ensure that mine operators comply with the Mine Act and related safety standards. 30 U.S.C. § 813(a). An inspector who discovers that a mine operator has violated a provision of the Mine Act or any related safety standard must issue a citation. *Id.* § 814(a). The Secretary is also required to assess civil penalties for each violation. *Id.* § 820(a).

In addition to citations, the Mine Act authorizes safety inspectors to issue "safety orders" to ensure onsite safety "[i]n the event of any *accident* occurring in a coal or other mine." Section 103(k), 30 U.S.C. § 813(k) (emphasis added). Safety orders allow inspectors to wield broad authority as they deem necessary. Under the Mine Act, the term "accident" is defined to include "a mine explosion, mine ignition, *mine fire*, or mine inundation, or injury to, or death of, any person." Section 3(k), *id.* § 802(k) (emphasis added). In other words, a safety order under section 103(k) can only issue in the face of an active, ongoing accident, of which a mine fire is but one example. In this case, the safety inspectors justified the safety orders based on their conclusion that the smoldering patches they observed on the coal stockpile were a "fire."

The Mine Act provides a different type of authority to inspectors when they discover an "imminent danger." "Withdrawal orders" require the mine operator to evacuate the area in which the imminent danger exists. Section 107(a), 30 U.S.C. § 817(a). The Mine Act defines an "imminent danger" as "any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated." *Id.* § 802(j).

A mine operator may contest any citation, order, or penalty before the Federal Mine Safety and Health Review Commission (the Commission), a five-member body also established by the Mine Act. The Commission appoints administrative law judges (ALJs) to hear and decide the dispute in the first instance. Either party to a dispute can appeal any decision of an ALJ to the Commission.

B

American Coal, a subsidiary of Murray Energy, operates a coal mine complex in Galatia, Illinois, composed of two underground mines: the New Millennium mine and the New Future mine. Each mine maintains various surface operations, including coal stockpiles where raw coal is stacked once it is extracted from the mines.

On January 19, 2010, two mine inspectors visited the Galatia complex and found what they determined were signs of "fire" at the New Future stockpile. As the inspectors later testified, they observed five spots on the stockpile that emitted smoke, radiated heat waves, and were covered in whitish ash produced by heated coal. One inspector also testified that he smelled an odor like sulfur. Neither inspector, however, observed any visible flames, glowing coals, or any other kind of illumination. The American Coal safety officer who accompanied the inspectors later testified that he did not believe the spots were smoldering, and characterized what the inspectors called white ash as nothing more than gray rock pulled from the mine.

Relying on their observations, the inspectors issued safety orders under section 103(k) of the Mine Act for the New Future stockpile, giving them broad authority over the operation until the "fire . . . presently burning in the coal pile"

was brought under control. J.A. 24. The inspectors also issued a citation to American Coal for failing to report the accident, and the Secretary of Labor later assessed a civil penalty in connection with that citation.

American Coal contested the orders, citation, and penalty. American Coal and the Secretary agreed that the dispute turned exclusively on the meaning of the word "fire" in the Mine Act. American Coal argued that the inspectors were not authorized to issue safety orders under section 103(k) because mere smoldering combustion is not a "fire." The ALJ agreed with American Coal, ruling that the term "fire" unambiguously required the existence of visible flame. Because all agreed that there were no visible flames on the New Future stockpile, the ALJ concluded that the safety orders were unjustified.

The Secretary appealed his decision to the Commission. Before the Commission, the Secretary explained that he interpreted "fire" to include both "events marked by flaming combustion" and "events marked by smoldering combustion that reasonably has the potential to burst into flames." The Secretary insisted that the spots the inspectors had observed on the surface of the stockpile satisfied his interpretation of "fire" because they were instances of smoldering combustion that could have ignited at any time. Thus the question before the Commission was whether the term "fire" in the Mine Act was ambiguous and, if so, whether the Secretary's interpretation of it was reasonable.

The Commission resolved that question in the Secretary's favor. The Commission pointed out that the term "fire" in the statute was inextricable from the preceding term "mine," as the only fires at issue under the Mine Act were necessarily those associated with mining. The Commission therefore

analyzed the Secretary's interpretation within the overall meaning of the statute instead of standing in isolation. The Commission concluded that the term "fire" was ambiguous and that the Secretary was free to interpret it to include both fires involving visible flames and smoldering fires that had the reasonable possibility of bursting into flames.

One member of the panel dissented. Though he agreed that the statute did not require the presence of visible flames to constitute "fire," he found the Secretary's definition impermissibly vague because it did not provide adequate guidance regarding when a given patch of smoldering combustion would present a reasonable risk of bursting into flame. The dissent feared that the term "reasonably" included in the Secretary's definition was too "open to subjective interpretations" and would prove "ultimately useless to operators." J.A. 327.

On remand, a new ALJ (the previous ALJ having retired), applied the Commission's ruling and upheld the safety order. The ALJ concluded that the spots the inspectors had observed met the Secretary's interpretation. American Coal appealed this decision, but this time the Commission declined to review the ALJ's determination.

American Coal timely petitioned for review, arguing that the term "fire" is not ambiguous, that the Secretary's interpretation of the term is not reasonable, and that there was not even sufficient evidence to support the Commission's conclusion that the Secretary's interpretation was satisfied here. We have jurisdiction over a final order of the Commission under 30 U.S.C. § 816(a)(1). We review the Commission's legal conclusions de novo. *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006). We review the Commission's findings of fact for substantial

evidence, meaning that we "determine whether there is such relevant evidence as a reasonable mind might accept as adequate to support the judge's conclusion." *Jim Walter Res., Inc. v. Sec'y of Labor*, 103 F.3d 1020, 1023-24 (D.C. Cir. 1997).

## II

### A

As a threshold matter, American Coal insists that we should reverse and remand without considering the merits of this dispute because the Commission exceeded its authority under the statute. The Mine Act forbids the Commission from considering any question that was not first presented to the ALJ. 30 U.S.C. § 823(d)(2)(A)(iii), (d)(2)(B). In the hearing before the ALJ, the parties stipulated that their dispute turned on whether there was a "fire" on the stockpile in the sense used in section 3(k) of the Mine Act. In its decision, the Commission focused on the larger statutory term "mine fire," concluding that "mine" provided indispensable context for "fire" and that a "mine fire" could exist even without visible flames. Because the Commission considered the meaning of the term "mine fire," as opposed to the meaning of the term "fire" standing alone, American Coal believes that the Commission improperly considered an argument the parties had not briefed.

We find this argument unpersuasive. "[A] reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory

scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (internal citation omitted) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). *See also Deal v. United States,* 508 U.S. 129, 132 (1993) (observing that it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"). In other words, the Commission did not consider a different question than the meaning of "fire" in section 3(k). It considered the question that the parties agreed was at issue and employed standard interpretive tools to answer it, including looking to the statutory context of the disputed term. The Commission was well within its authority to do so.

B

The Secretary's interpretation of the Mine Act must "'be given weight by both the Commission and the courts'" under the familiar two-step *Chevron* standard. *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 5-6 (D.C. Cir. 2003) (quoting *Sec'y of Labor v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir. 1989)). Under the first step of *Chevron* we consider whether Congress has unambiguously addressed the question. *See Cannelton Indus.,* 867 F.2d at 1435. If not, we ask whether the Secretary's interpretation is reasonable. *Id.* Especially in the context of a remedial health-and-safety act like the Mine Act whose "primary purpose . . . [is] to protect mining's most valuable resource—the miner," *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 823 F.2d 608, 617 (D.C. Cir. 1987) (internal quotation marks omitted), we must "'liberally construe[]'" the Act's terms, meaning that we are all the more "obliged to defer to the Secretary's miner-protective construction of the Mine Act so

long as it is reasonable." *Cannelton Indus.*, 867 F.2d at 1437 (internal quotation marks omitted).

In the statutory scheme of the Mine Act, "the Secretary's litigating position before [the Commission] is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a . . . health and safety standard," and so is also deserving of deference. *Excel Mining*, 334 F.3d at 6 (alterations in original) (quoting *RAG Cumberland Res. LP v. Fed. Mine Safety & Health Review Comm'n*, 272 F.3d 590, 596 n.9 (D.C. Cir. 2001)); *cf. Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156-57 (1991) (explaining that the OSH Act's analogous allocation of responsibilities requires according *Chevron* deference to the Secretary's litigating positions).

1

We conclude that "fire" as used in the Mine Act is ambiguous because there are competing, plausible ways to read the term.

American Coal insists that there was widespread agreement at the time the Mine Act was passed in 1977 that a fire existed only when there were visible flames. To support this proposition, American Coal cites several general-usage dictionary definitions and a number of fire insurance cases ranging from 1905 to 1969, which arguably identify fire exclusively with the presence of flames. *See, e.g.*, *W. Woolen Mill v. N. Assurance Co. of London*, 139 F. 637, 639 (8th Cir. 1905) ("No definition of fire can be found that does not include the idea of visible heat or light, and this is also the popular meaning given to the word.").

The Secretary responds principally in two ways. First, he cites a number of cases of similar vintage that explicitly distinguish between "smoldering fires" and "flaming fires," to show that contemporary usage employed the term "fire" in different ways. *See, e.g.*, *Triple A Machine Shop, Inc. v. Waterman Steamship Co.*, 221 F.2d 916, 917 (9th Cir. 1955) ("[A] fire so started in the [ship's hold] would smoulder many hours before it burst into flame."); *Ravenscroft v. United States*, 88 F.2d 418, 419 (2d Cir. 1937) (noting "the danger of admitting air to a smoldering fire in cotton"); *Petition of United States*, 105 F. Supp. 353, 359 (S.D.N.Y. 1952) ("[Opening the hatch] created a strong circulation of air, which fanned the smoldering fire into flame." (internal quotation marks omitted)). Second, the Secretary points to a number of technical references focusing on mining and fire prevention that distinguish smoldering fire from flaming fire. *See, e.g.*, NATIONAL FIRE PROTECTION ASSOCIATION, FIRE PROTECTION HANDBOOK 2-18 (Gordon P. McKinnon & Keith Tower eds., 14th ed. 1976) ("The observer can be sure there is fire where flame can be seen. Flame is rarely separated from the burning materials by any appreciable distance. However, in certain types of smoldering fires without evidence of flame, heat, smoke, and gas can develop."); DICTIONARY OF MINING, MINERAL, AND RELATED TERMS 246, 436 (1st ed. 1968) (defining "fire" as "[f]uel in a state of combustion" and defining "combustion" as "[t]he action or operation of burning" that can be but is not necessarily "accompanied by the generation of light and heat").

We agree with the Secretary. The parties have both presented contemporary readings of the term "fire" that support their position. For that reason, *Chevron* step one is relatively straightforward here. "Confronting diverse readings of the statutory text, we are obliged to defer to the Secretary's miner-protective construction of the Mine Act so long as it is

reasonable." *Cannelton Indus*., 867 F.2d at 1437. The parties have both provided competing uses of the term in contemporary judicial decisions, showing that lawyers and judges of the time sometimes understood "fire" to require visible flames and sometimes understood that a "fire" could exist even when there was only smoldering combustion. And American Coal cannot successfully distinguish the contemporary cases cited by the Secretary that clearly differentiate between smoldering fires and flaming fires. True, each of those cases involved a smoldering fire that was succeeded by a flaming fire, and the damage that provoked the dispute in each circumstance was caused by the later flaming stage. But that merely underscores that in each case the court considered the fire to have begun once smoldering commenced, even though flames had not yet broken out. This alone is reason enough to conclude that "fire" is ambiguous: Congress may have meant to include only flaming fires in the illustrative list of accidents in the Mine Act, but it may also have intended that list to include smoldering fires as well.

We also note that the term "fire" is identified in the statute merely as one item in an inclusive list designed to illustrate, not comprehensively enumerate, the various forms of "accident" that can justify issuing a safety order under section 103(k). *See* 30 U.S.C. § 802(k) (stating that an "accident," for purposes of the Mine Act, "*includes* a mine explosion, mine ignition, mine fire, or mine inundation, or injury to, or death of, any person" (emphasis added)); *see also Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation." (internal quotation marks and citation omitted)). In other words, Congress enacted the Mine Act to create a comprehensive scheme empowering the Secretary and his mine inspectors to respond rapidly and flexibly to risks to miner safety. And as we have already pointed out, the Mine

Act is a remedial health-and-safety statute, meaning that its terms are to be read broadly to offer maximum protection for miner safety. It would be senseless, in this context, to read a single term in the statute's inclusive, illustrative list of possible accidents in the narrowest possible way, based on a cherry-picked selection of contemporary decisional law, so as to preclude the Secretary from adopting a reasonable construction that increased the safety of miners. On this basis, we are satisfied that there are competing, plausible interpretations of the term "fire," and so find it ambiguous. *See Cannelton Indus.*, 867 F.2d at 1437.

It is true, as American Coal points out, that the general-usage dictionaries from the period when Congress passed the Mine Act, define fire only as flaming combustion. But these general-usage dictionaries do not change our view that the term "fire" is ambiguous in the Act. General-usage dictionaries cannot invariably control our consideration of statutory language, especially when the "dictionary definition of . . . isolated words[] does not account for the governing statutory context." *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010). After all, "'[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Yates v. United States*, 135 S. Ct. 1074, 1081-82 (2015) (plurality opinion) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (alterations in *Yates*)); *see also id.* at 1092 ("[W]e interpret particular words in their context and with a view to their place in the overall statutory scheme. And sometimes that means . . . that the dictionary definition of a disputed term cannot control." (Kagan, J., dissenting) (internal quotation marks and citation omitted)). Though our assessment of the ambiguity of statutory text sometimes begins and ends with the definitions provided in

contemporary general-usage dictionaries, on other occasions it is useful and important to consult more technical sources where, as here, the statute focuses on a specific technical context. The Mine Act is designed to secure and enhance the safety of miners in and around mines. The characteristics of fire that matter for the purposes of this statute are those relevant in the context of mining and industrial safety. And the general-usage dictionaries American Coal cites cannot and do not account for these particular characteristics. The Secretary, on the other hand, has provided technical resources, also from the period when Congress passed the Act, that define fire in the specific context of mining and industrial safety. For example, the Fire Protection Handbook that the Secretary has produced unmistakably supports the Secretary's position by identifying the distinct risks associated with "smoldering fires." NATIONAL FIRE PROTECTION ASSOCIATION, FIRE PROTECTION HANDBOOK 4-34 (George H. Tryon & Gordon P. McKinnon eds., 13th ed. 1969); *see also* NATIONAL FIRE PROTECTION ASSOCIATION, FIRE PROTECTION HANDBOOK 2-18 (Gordon P. McKinnon & Keith Tower eds., 14th ed. 1976) (same). And the Dictionary of Mining, Mineral, and Related Terms identifies "the generation of light and heat" merely as an "example" of the attributes of fire, not as a necessary precondition for fire to exist. DICTIONARY OF MINING, MINERAL, AND RELATED TERMS 246, 436 (1st ed. 1968); *see also* DICTIONARY OF MINING, MINERAL, AND RELATED TERMS 114 (2d ed. 1997) (same). In other words, paying attention to the context of the Mine Act, the exchange of contrasting definitions from various dictionary sources provides further basis to conclude that the term "fire" is ambiguous.

American Coal argues that the structure of the Act as a whole unambiguously requires that the term "fire" cover only combustion that displays visible flames. Specifically,

American Coal claims that the Secretary's interpretation is clearly foreclosed by the interaction between the two types of orders inspectors can issue to deal with mine accidents: safety orders under section 103(k) and withdrawal orders under section 107(a). American Coal argues that withdrawal orders under section 107(a) are designed to deal with conditions that pose a future risk of danger, while safety orders under section 103(k) are designed to deal only with ongoing or completed accidents, not their prevention. In American Coal's view, a smoldering fire is a pre-accident condition, dangerous only because it poses the risk that it will ignite and become a flaming fire. Thus, American Coal insists that section 103(k) should not permit inspectors to issue safety orders to control smoldering fires because 103(k) orders are authorized only to confront actively occurring accidents, not to prevent future accidents. Instead, inspectors should be authorized to deal with smoldering fires only by issuing withdrawal orders under section 107(a) because that section offers appropriate authority for prophylactic measures.

We disagree with American Coal's view of the statute. For one thing, we cannot agree that smoldering combustion is nothing more than a pre-fire state, important only because it might burst into flames in the future. Just the opposite. As the Secretary has explained, the self-heating properties of coal mean that coal stockpiles can begin smoldering and reach high temperature points without igniting, generating substantial heat and smoke that can imperil miners in the vicinity even without bursting into flames. Worse, smoldering combustion consumes coal just as surely as does flaming combustion. Patches of smoldering combustion can thus eat away at the stockpile from within, creating a hidden cavity that can destabilize the stockpile as a whole or into which a miner can fall. A smoldering fire poses active risks and can

constitute an "accident occurring" on a coal stockpile in its own right. 30 U.S.C. § 813(k).

Nor do we think American Coal's account of the structure of the Mine Act is correct. Section 103(k) orders are broad, flexible tools, authorizing inspectors to confront many different circumstances that present immediate risks. For example, once safety orders are issued under section 103(k), inspectors often modify them to change the requirements imposed on mine operators as the accident evolves. *See Performance Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 642 F.3d 234, 237 (D.C. Cir. 2011) ("It is undisputed that [section] 103(k) orders undergo frequent modifications."). Inspectors sometimes issue section 103(k) safety orders first, while trying to deal with an accident, and only thereafter issue section 107(a) withdrawal orders to shut the mine down completely. *See, e.g.*, *Clinchfield Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 895 F.2d 773, 774 (D.C. Cir. 1990). Most obviously, section 103(k) safety orders allow inspectors to impose whatever restrictions or requirements they judge appropriate to deal with the accident in question, while section 107(a) withdrawal orders simply close the mine. In short, section 107(a) is an emergency blunderbuss, unsubtle and extreme, for circumstances in which getting miners out and away is the only appropriate response. Section 103(k), which the inspectors used here, is a subtler instrument that can be tailored to any situation.

There is no risk that finding the term "fire" ambiguous will destabilize the statute. To the contrary, allowing the Secretary to wield section 103(k) orders in a broader range of circumstances accords with the statute's structure by making a flexible, nuanced tool available to handle accidents while they happen but before they become critical.

To sum up, the contemporary body of decisional law shows competing definitions of the term "fire" in a variety of contexts. General-usage and technical dictionary definitions from the period when Congress passed the Mine Act offer support for both sides of the debate. And finding ambiguity in this statutory term does not pose a risk to the structure of the statute but rather will conform to that structure by enabling the Secretary to use the flexible tool of section 103(k) safety orders in an appropriate range of circumstances. Because the parties to this dispute have shown that the term "fire" is susceptible to multiple plausible interpretations, we find it ambiguous and move on to consider whether the Secretary's interpretation warrants deference.

2

Under *Chevron* step two, we defer to the Secretary's interpretation of an ambiguous term unless it is unreasonable or inconsistent with the statute. The Secretary's interpretation contains two elements. To qualify as "fire," non-flaming combustion must qualify as "smoldering" combustion, and it must also present a reasonable chance of bursting into flame. We find both elements of this interpretation perfectly reasonable.

First, nothing in the statute expressly prohibits the Secretary from reading "fire" to cover smoldering combustion. And as we explained in our analysis under *Chevron* step one above, there is substantial authority in judicial decisions and relevant technical references to support the conclusion that smoldering combustion qualifies as a type of "fire" whether it displays visible flames or not. It comports with the goal of protecting miner safety not to ignore an entire category of fire simply because it does not show flames.

We also conclude that the Secretary was entitled to limit his interpretation of "fire" to include only smoldering fires that reasonably could ignite at any time. The Secretary has explained that the risks posed by a smoldering fire cross a critical line that warrants regulation when it reaches the point at which it might burst into flame. At that point, the Secretary has concluded, a smoldering fire's danger to miners is significant enough to require regulation. That conclusion is reasonable. By limiting the scope of his authority to smoldering fires that reasonably could burst into flame at any time, as opposed to all smoldering combustion, the Secretary allows "operators and inspectors [to] focus their attention where it will do the most good" and avoids "unduly or unnecessarily burden[ing] operators or keep[ing] inspectors from attending to other important matters." Resp. Br. 43. This explanation adequately justifies the Secretary's decision to limit the scope of his oversight.

American Coal raises three challenges to the reasonableness of the Secretary's interpretation. None succeed. First, American Coal argues that the interpretation is unconstitutionally vague, leaving mine operators unable to comply and vulnerable to arbitrary and capricious enforcement, which, it submits, is a very ineffective way to promote miner safety. The Secretary rejoins that the interpretation is adequately specific because it limits its scope to smoldering combustion that "reasonably" might ignite. The Secretary is confident that "reasonable" mine operators, experienced in the industry and well-schooled in the characteristics of coal and its propensity to self-heat and ignite, will be able to comply.

We agree. There is no doubt that the Secretary has provided limited direction. But an interpretation need not be prolix to avoid impermissible vagueness. It must merely

provide sufficient guidance so that reasonable regulated parties, aware of the goal the regulation seeks to accomplish, have "fair warning" of what the regulation requires. *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997). This interpretation passes that bar. After all, the opinions that will matter in enforcing this standard are those of mine safety inspectors and mine operators who see smoldering patches on coal stockpiles with great regularity and have extensive experience in recognizing those patches of smoldering combustion that might soon ignite. We are confident that reasonable mine operators and reasonable safety inspectors will prove able to implement the Secretary's standard in practice.

Second, American Coal argues that the Secretary failed to provide a reasonable explanation for his decision to limit his interpretation of "fire" to cover only smoldering combustion that reasonably has the potential to burst into flames. We disagree. Based on his experience, the Secretary concluded that once smoldering fires have reached the point at which ignition is imminent, they pose risks to the miner significant enough to constitute an active accident. As we have already explained above, this conclusion was reasonable. American Coal seems to suggest that the Secretary could only reasonably define "fire" to include all smoldering combustion as well as all flaming combustion. But there is no basis for that position. After all, an agency need not target every danger in order to target any danger. *See, e.g.*, *Pers. Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 544 (D.C. Cir. 1995) ("An agency does not have to make progress on every front before it can make progress on any front." (internal quotation marks omitted)). And agencies may marshal their limited resources by pursuing their goals "as priorities demand." *Nat'l Cong. of Hispanic Am. Citizens (El*

*Congreso) v. Marshall*, 626 F.2d 882, 888 (D.C. Cir. 1979). In light of these principles, the Secretary has provided a reasonable explanation for the scope of his interpretation of "fire."

We acknowledge, as American Coal points out, that none of the technical treatises the Secretary has cited define fire by pointing to the reasonable possibility of ignition. But the Secretary has adequately explained his reasoning in limiting the scope of "fire" under the statute to cover only smoldering combustion that reaches the point at which ignition is an immediate risk. The fact that a dictionary or manual does not make that distinction in no way invalidates the Secretary's otherwise reasonable explanation for adopting it.

Finally, American Coal argues again that the Secretary's interpretation of the statute is foreclosed by the interaction between section 103(k) and section 107(a) of the Mine Act. We reject this argument for the reasons we have already stated.

The Secretary's interpretation of "fire" is reasonable. It furthers the statute's purpose, provides adequate guidance for its implementation, and conforms harmoniously to the statute's text and structure. We defer to the Secretary.

C

Separately, American Coal argues that, even if the Secretary's interpretation of the term "fire" is reasonable, the Commission erred in finding that interpretation satisfied here because there was insufficient evidence either that the patches on the stockpile were instances of smoldering combustion or that those patches could reasonably burst into flame at any time. Under the deferential standard of review we use to

evaluate the Commission's factual determinations, we reject both arguments. *See Jim Walter Res., Inc.*, 103 F.3d at 1023-24.

1

Substantial evidence supported the Commission's determination that the safety inspectors observed patches of smoldering combustion. One mine safety inspector, Wendell Crick, testified that he observed smoking or smoldering areas and whitish ash, smelled a sulfur-like odor, and observed heat waves rising from the smoldering areas. The other inspector also testified that he saw smoldering patches. American Coal sought to counter this evidence with the competing testimony of its supervisor, who claimed that what Crick saw was nothing more than gray rock. We conclude that the Commission was justified to rely on the testimony of the mine safety inspectors over that of American Coal's witness.

American Coal attacks Crick's testimony by insisting that, when he discussed visible heat waves rising from the patches on the coal stockpile, he was merely speaking generically about the phenomena generally associated with smoldering coal, not any observations he actually made at the time. But when pressed about what he saw rising from the stockpile, Crick responded, "You can see the heat waves and . . . a whitish coat of ash around the areas that smoke was rising from." J.A. 103. The Commission was entitled to determine from this testimony, especially Crick's reference to "the areas that smoke *was rising from*," that Crick was in fact reporting his observations, not speaking in the abstract. *Id.* After all, when reviewing an agency determination for substantial evidence the question is not whether the challenger's construction is plausible but whether the record can support the agency's conclusion. *See Fla. Gas Transmission Co. v.*

*FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010). The Commission's determination satisfies that standard.

American Coal also argues that the inspectors' testimony was not reliable because the Secretary did not show that either held advanced academic degrees or had completed scientific studies relevant to the self-heating properties of coal. There is no basis for this challenge. Crick had extensive experience in coal mining as a foreman, safety analyst, and surface operation instructor. He had been a mine safety inspector for three years, and he had extensive volunteer firefighter training and experience. We need not determine the minimum credentials a mine inspector must have for his judgments to provide evidence on which an ALJ can permissibly rely. Crick's credentials are adequate to justify the Commission's reliance on his observations.

2

We also find that substantial evidence supports the Commission's determination that the smoldering patches reasonably had the potential to burst into flame.

In the original hearing, Crick testified that in his judgment "if the oxygen or the wind blows or . . . an amount of air hit[]" the smoldering patches "just right," they could "burst into flame spontaneously at any time." J.A. 107-08. American Coal presented no evidence controverting Crick's assessment. The Commission was entitled to credit Crick's testimony and rely on it to conclude that the smoldering patches satisfied the Secretary's interpretation.

American Coal argues that Crick's testimony contradicts itself. Crick testified that the wind was blowing while he was inspecting the New Future stockpile, yet the smoldering

patches had not ignited. Thus his claims about the ignitibility of the smoldering patches must be false. But Crick did not say that the smoldering patches he observed would necessarily ignite whenever the wind blew. The fact that there was wind does not mean that the patches were exposed to a sudden increase in oxygen level sufficient to trigger their ignition.

American Coal also argues that Crick's testimony should not have been credited because the first ALJ rejected his testimony after seeing him testify in person, while the second ALJ reversed and credited his testimony on remand based only on the transcript of the hearing. Not so. The first ALJ concluded only that Crick's testimony did not warrant "great weight," not that it was incredible. And that determination was a natural one given that he had already rejected the Secretary's interpretation of the term "fire." Crick's testimony regarding the smoldering combustion he observed only makes a difference if smoldering combustion can qualify as a "fire." Because the ALJ had rejected that construction, it made little difference that Crick had testified that "a fire could start up at any time." After the Commission held that the ALJ was wrong to reject the Secretary's interpretation, Crick's testimony was of course far more valuable. Thus on remand the second ALJ had a blank slate to evaluate the credibility of Crick's testimony. And an ALJ's credibility determination is "entitled to great deference." *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1107 (D.C. Cir. 1998). We cannot say that the second ALJ erred in any way when she relied on Crick's uncontradicted testimony, backed up by Crick's experience, that the patches on the stockpile that day posed the risk of bursting into flame.

We acknowledge that there was little evidence presented on whether the smoldering piles might soon burst into flames. But "[t]he substantial evidence inquiry turns not on how many

discrete pieces of evidence the Commission relies on, but on whether that evidence adequately supports its ultimate decision." *Fla. Gas Transmission*, 604 F.3d at 645. Crick's testimony was enough to show that the Secretary's interpretation was satisfied. As we have already noted, the question we ask when evaluating agency action under the substantial evidence standard is not whether the petitioner can reasonably read the evidence another way but only whether the agency was reasonable to read the evidence the way it did. *Id.* The Commission's determination on this score satisfies that standard.

### III

For the foregoing reasons, we deny the petition for review.